RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0068p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

STEPHEN MICHAEL FLEMING,
　　　　　　　　*Petitioner-Appellee,*

　　　　*v.*

LINDA METRISH, Warden,
　　　　　　　　*Respondent-Appellant.*

No. 07-2311

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-72365—Arthur J. Tarnow, District Judge.

Argued: October 30, 2008

Decided and Filed: February 25, 2009

Before: CLAY, GILMAN, and ROGERS, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Janet A. VanCleve, OFFICE OF THE MICHIGAN ATTORNEY GENERAL,
Lansing, Michigan, for Appellant. Douglas W. Baker, STATE APPELLATE DEFENDER
OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Raina I. Korbakis, OFFICE OF
THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. Douglas
W. Baker, STATE APPELLATE DEFENDER OFFICE, Detroit, Michigan, for Appellee.

　　　　GILMAN, J., delivered the opinion of the court, in which ROGERS, J., joined.
CLAY, J. (pp. 24-55), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

　　　　RONALD LEE GILMAN, Circuit Judge. Stephen Michael Fleming was convicted
of second-degree murder and a related firearm offense. He was sentenced to life in prison
on the two charges. Fleming then petitioned for state postconviction relief, but was turned
down at all levels of the state judiciary. He subsequently sought habeas corpus relief in

1

federal court, arguing that the state trial court erred by denying a motion to suppress his confession and by not allowing him to call a witness who purportedly would have aided his defense. The district court conditionally granted his petition for a writ of habeas corpus. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions to deny Fleming's petition.

## I. BACKGROUND

### A.      Factual background

Scott York was found dead in the woods of Moffat Township, Michigan on October 21, 1999. York had been shot both in the face and in the back of the head. In early November 1999, Fleming's brother provided Detective Robert Lesneski with information that led Lesneski to conclude that Fleming was involved in York's death. Fleming's brother persuaded Fleming to explain his connection with York to Lesneski. Lesneski subsequently arranged a meeting with Fleming.

During the meeting, Fleming told Detective Lesneski that he had picked up a hitchhiker on October 21, 1999. The hitchhiker and Fleming proceeded to a store to purchase alcoholic beverages and then left to drink together. Fleming told Lesneski that he later dropped off the hitchhiker somewhere near Sterling, Michigan. Lesneski showed Fleming a photograph of a man and asked whether it depicted the hitchhiker. After Fleming said that it did, Lesneski identified the man in the photo as York.

The police subsequently obtained a search warrant for Fleming's residence and other buildings on his farm in mid-November 1999. Upon arriving at Fleming's residence, Detective Lesneski said that Fleming was "very cooperative" and even told the officers about illegal drugs that were located on the property. After finding the drugs, Lesneski approached Fleming to "read him his rights" and to ask if Fleming would speak with him. Fleming refused to answer "questions about that fucking homicide or homosexual activity," and then said that he was "not going to be one of the guys that you hear about in 60 minutes, that went to jail for something he didn't do." Lesneski subsequently placed Fleming under arrest for possessing illegal drugs and had him put in the back seat of a police squad car. The detective

estimated that Fleming was placed in the car between 1:00 and 1:30 p.m. A search continued on Fleming's property for evidence relating to York's death.

Approximately one hour later, Fleming was taken from the squad car to a narcotics van to sit with Officer Robert Clayton, where Fleming would sit for roughly two hours. Fleming and Officer Clayton engaged in "small talk" until Detective Lesneski approached the van and smiled. Clayton surmised that something "positive" had happened. Indeed, the police had found the murder weapon and were therefore "quite excited."

Officer Clayton next told Fleming that things did not look good for him and that "maybe he needed to do the right thing." Fleming testified, on the other hand, that Clayton told him that "it's obviously not a good sign for you," and that "[i]f you have a chance at anything, . . . I would [] strongly recommend that you get with the program is my advice." Clayton denied ever telling Fleming "[t]o get with the program." There is no dispute, however, that between one and five minutes later Clayton asked whether Fleming wished to speak with Detective Lesneski. Fleming agreed to do so. Shortly thereafter, Lesneski took Clayton's place in the van.

Detective Lesneski testified that he did not ask any questions or begin an interrogation when he entered the van. He said that Fleming began to weep. Lesneski then moved the van out of view of the other officers who were in the vicinity because Fleming did not want them to see him crying. After Lesneski moved the van, Fleming said that he felt hot and nauseous. Lesneski opened the van's doors for Fleming so that he could get some air. After asking for "a couple of minutes" to "get [his] head straight," Fleming confessed to York's murder. Fleming then asked Lesneski whether the police had found the gun. Lesneski replied that they had.

Detective Leskneski maintains that he let Fleming speak without interruption until he was finished. Lesneski said that he then told Fleming the following:

> I read you your rights once today, . . . and you didn't want to talk to me . . . .
> Now I am required by law to read you your rights. I have to protect you.
> My job is to protect you and I need to do that. I don't want you waking up
> tomorrow feeling sorry for something you did or didn't say.

Lesneski proceeded to read Fleming his *Miranda* rights for the second time. Fleming acknowledged that he understood his rights. Lesneski then questioned Fleming about York's death. In response, Fleming provided "far more information" about the circumstances surrounding the killing. Approximately an hour later, Detective Lesneski tape recorded Fleming's confession at a police station. Lesneski read Fleming his *Miranda* rights a third time before recording the statement. The recording was played for the jury at trial.

Fleming offered a different version of the conversation that took place inside the van with Detective Lesneski. According to Fleming, Lesneski initiated the conversation and claimed to have

> found a weapon and that it [would] be within my best interests to cooperate. He told me that I did need to—he told me to be careful of what I say, that don't be sorry for —you don't want to be sorry for something you have or haven't said. I don't remember the exact words, but there was a conversation before I had—I didn't come right out and say, "Yeah, I done it."

## B.      Procedural background

Fleming's counsel filed a pretrial motion to suppress the statements Fleming made to Detective Lesneski. In April 2000, the trial court conducted a so-called *Walker* hearing, which under Michigan law refers to a "phase of motion practice in which all issues of admissibility of a defendant's statements are resolved." *People v. Ray*, 430 N.W.2d 626, 631 (Mich. 1988) (discussing *People v. Walker*, 132 N.W.2d 87 (Mich. 1965)). Fleming's counsel framed the issues at stake in the hearing as follows: "[W]e have both questions regarding the right to remain silent and the Fifth Amendment, also got [sic] the right to an attorney. Both of those things were asserted on behalf of the defendant." The prosecutor framed the issue, in contrast, as "nothing but voluntariness." Accepting the prosecutor's statement of the issue, the state trial court held, without explaining why, that "[t]he only issue . . . is whether or not [the confession] was voluntary."

In May 2000, Fleming stood trial in the state court. He maintained that he had killed York in self-defense, thinking that York was going to harm him. In support of this claim, Fleming testified that York bragged about robbing drug dealers and that he had asked Fleming for "a couple hundred dollars" to buy crack cocaine. Fleming also claimed that

York became furious when he refused, telling Fleming that "I am going to kick your fucking teeth right through your head." He further alleged that he shot York twice before York hit the ground because York would not stop advancing toward him after Fleming warned him to stop. In addition to his own testimony, Fleming presented two witnesses who said that York had a reputation for being violent. The trial court refused, however, to allow Fleming to call a witness who allegedly saw York rob a drug dealer the week before York was killed.

After exhausting his state-court remedies, Fleming sought a writ of habeas corpus in federal district court, alleging that he was being held in a state prison in violation of his constitutional rights. The district court conditionally granted Fleming's petition, holding that his Fifth Amendment right to remain silent had been violated and that he was denied his constitutional right to mount a defense because the trial court did not permit Fleming to call a witness who purportedly would have bolstered his self-defense claim. This timely appeal followed.

## II.  ANALYSIS

### A.      Standard of review

"In a habeas corpus appeal, we review the district court's legal conclusions de novo, but will not set aside its factual findings unless they are clearly erroneous. The standard for reviewing state-court determinations on habeas, by contrast, is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), codified at 28 U.S.C. § 2254(d)." *Ivory v. Jackson*, 509 F.3d 284, 291 (6th Cir. 2007) (citation omitted). AEDPA provides that a federal court

> may not grant a writ of habeas to a petitioner in state custody with respect
> to any claim adjudicated on the merits in state court unless (1) the state
> court's decision 'was contrary to, or involved an unreasonable application
> of, clearly established Federal law, as determined by the Supreme Court' or
> (2) the state court's decision 'was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceedings.'

*Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002) (quoting 28 U.S.C. § 2254(d)) (citation omitted).

A state-court decision is considered "contrary to . . . clearly established federal law" if the two are "diametrically different, opposite in character or nature, or mutually opposed."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000) (internal quotation marks omitted). Alternatively, to be deemed an "unreasonable application of . . . clearly established Federal law," a state-court decision on the merits must be "objectively unreasonable," not simply erroneous or incorrect. *Id.* at 409-11. The state court's findings of fact are presumed to be correct unless they are rebutted by clear and convincing evidence. *Benge v. Johnson*, 474 F.3d 236, 241 (6th Cir. 2007).

**B.      Alleged Fifth Amendment violation**

### 1.      *Procedural default*

The district court held that the Michigan Court of Appeals unreasonably applied Supreme Court precedent in concluding that Fleming's Fifth Amendment right to remain silent was not violated during the investigation of York's murder. As a threshold matter, however, the state argues that the district court should not have even reached the issue because the same was procedurally defaulted. But the state's counsel, according to the district court, "acknowledged at oral argument [that] the issue had been raised in state court."

The state nevertheless argues that the Fifth Amendment issue was not *properly* raised during the pretrial *Walker* hearing because, according to the state, the sole purpose of such hearings is to address whether a particular confession was provided voluntarily. Fleming responds that, even if the Michigan courts originally created *Walker* hearings to assess voluntariness, "the profession [came] to use the term[] '*Walker* hearing' to refer to that phase of motion practice in which all issues of admissibility of a defendant's statements are resolved." *See People v. Ray*, 430 N.W.2d 626, 631 (Mich. 1988).

We find no error in the district court's adoption of Fleming's persuasive response regarding the scope of a *Walker* hearing. Moreover, the state's concession that the *Miranda* issue "had been raised in state court" negates a finding of procedural default. We therefore turn to the merits of Fleming's Fifth Amendment *Miranda* claim.

## 2.      *Admissibility of Fleming's confession*

Under *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966), law enforcement officers must cease questioning a suspect who invokes his right to remain silent or to have an attorney present. This does not mean that statements obtained after a suspect invokes that right are necessarily inadmissible in all cases. Instead, "the admissibility of statements obtained after the person in custody has decided to remain silent depends . . . on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).

We disagree with the district court's conclusion that the Michigan Court of Appeals unreasonably applied *Mosley*. The district court's analysis turned on its determination that Officer Clayton "interrogated" Fleming while he was in custody. We will therefore address the issue of whether there was an interrogation before turning to the Michigan Court of Appeals's application of *Mosley*.

### a.      *Whether Fleming was interrogated by the police*

In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court defined the term "interrogation" in the *Miranda* context as follows:

> "Interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.
>
> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Id.* at 300-02 (emphasis in original). Police officers placed Innis under arrest, advised him of his *Miranda* rights, and took him to a police station in a patrol car. *Innis*, 446 U.S. at 293-94. "The respondent stated that he understood [his *Miranda*] rights and wanted to speak with a lawyer." *Id.* at 294. While in the car, however, the officers began to speak to each other

about the murder weapon, which they had not yet located. *Id.* at 294. One of the officers testified as follows:

> I was talking back and forth with [a second police officer] stating that I frequent this area while on patrol and [that because a school for handicapped children is located nearby,] there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves.

*Id.* at 294-95 (second alteration in original).

The second officer "apparently shared his fellow officer's concern," indicating that he "more or less concurred with [the first officer] that it was a safety factor and that we should, you know, continue to search for the weapon and try to find it." *Id.* at 295. Sometime during the course of this discussion, Innis "interrupted the conversation, stating that the officers should turn the car around so he could show them where the gun was located. . . . The respondent then led the police to a nearby field, where he pointed out the shotgun under some rocks by the side of the road." *Id.*

After considering the above facts, the Supreme Court held that the officers' conversation was not reasonably likely to elicit an incriminating response. *Id.* at 302. The court noted that nothing in the record indicated that the suspect was "peculiarly susceptible to an appeal to his conscience," and further elaborated that

> [t]he case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few off hand remarks, we cannot say that the officers should have known that it was reasonably likely that [the suspect] would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that the respondent was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

*Id.* at 302-03.

In the case before us, the Michigan Court of Appeals similarly concluded that Officer Clayton's brief remarks did not constitute an interrogation within the meaning of *Miranda*.

Accepting Fleming's account of the events as true, the Michigan court characterized Officer Clayton's comments as "(i) a mild admonition to 'do the right thing' or 'get with the program'; and (ii) an inquiry as to whether [Fleming] now wished to talk to the lead investigating officer." The court stated:

> As to (i), given the defendant's repeated denials of involvement in the instant offense, as well as his general familiarity with the justice system, we are not convinced that these comments were 'reasonably likely to elicit an incriminating response,' as necessary to constitute an interrogation. In regard to (ii), we have also recognized that it is appropriate to present new information to an individual so that 'an informed an intelligent assessment' of his or her options may be made.

We find nothing unreasonable about the Michigan appellate court's application of the interrogation standard set forth in *Innis*. The record reasonably supports a finding that Fleming was not subject to "a measure of compulsion above and beyond that inherent in custody itself." *See Innis*, 446 U.S. at 300. Nor is this a case "where the police carried on a lengthy harangue in the presence of the suspect." *See id.* at 303. There is no evidence, moreover, indicating that Fleming was "peculiarly susceptible to an appeal to his conscience." *See id.* Instead, just as in *Innis*, Officer Clayton's comments involved a "brief conversation" that including nothing more than "a few off hand remarks" that were not "particularly 'evocative.'" *See id.*

We recognize that *Innis* is arguably distinguishable on the basis that the conversation in *Innis* occurred between two police officers, and was not directed toward the suspect himself. *See id.* at 294-95. Officer Clayton's brief remarks were, in contrast, clearly aimed at Fleming. Such a distinction might be significant if an officer's brief remarks morphed into, for example, a "lengthy harangue" because, other things being equal, extended comments directed toward a suspect are more likely to elicit an incriminating response. But this court has previously rejected a constitutional challenge to cursory comments aimed at a suspect in an analogous context. *See United States v. Hurst*, 228 F.3d 751, 760 (6th Cir. 2000) (holding that "the mere statement by [a law-enforcement official] that 'we've got good information on you,' viewed in context, contains no compulsive element suggesting a Fifth Amendment violation under the circumstances.").

There are strong arguments both for and against construing Officer Clayton's comments as an interrogation. Indeed, were Fleming's appeal a direct one to be reviewed de novo, the possibility exists that we might have agreed with Fleming's position. But the fact that a federal court might disagree with the Michigan Court of Appeals's application of *Innis* does not justify the conclusion that the Michigan court unreasonably applied the Supreme Court's decision. *See Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (holding that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly"); *see also Hereford v. Warren*, 536 F.3d 523, 528 (6th Cir. 2008) ("Our task is not to determine whether the state court reached the correct outcome, but rather to determine whether the court's application of clearly established federal law is objectively unreasonable—'a substantially higher threshold.'") (quoting *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939 (2007)). We conclude that the Michigan Court of Appeals's determination regarding a lack of interrogation by Officer Clayton was not an "unreasonable application of . . . clearly established Federal law." *See Williams v. Taylor*, 529 U.S. 362, 376 (2000).

Finally, we note that Fleming disputed Detective Lesneski's account of the in-van interview that took place after Officer Clayton's remarks. Although Lesneski claimed that he said nothing material to Fleming when Lesneski entered the van, Fleming asserts that Lesneski encouraged him to cooperate. The state trial court failed to resolve this factual dispute. But even if Fleming's version of the events is assumed to be true, we would still not conclude that the Michigan Court of Appeals unreasonably applied *Mosley*. We will explain why in the course of the discussion immediately below.

### b.     *Whether the Michigan Court of Appeals unreasonably applied* Mosley

The district court's finding that Officer Clayton interrogated Fleming fueled its analysis of *Michigan v. Mosley*, 423 U.S. 96 (1975), and, in turn, its conclusion that the Michigan Court of Appeals unreasonably applied that case. In *Mosley*, the Supreme Court discussed the circumstances under which a police officer may resume questioning a suspect who has previously exercised the right to remain silent under *Miranda*. The Court held that, when a defendant invokes the right to remain silent, the officers have the duty to

immediately cease questioning under *Miranda*. But the Court sought to avoid two extreme interpretations of that obligation:

> To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests.

*Mosley*, 423 U.S. at 102. Seeking to avoid these extremes, the Court adopted the following standard: "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104.

The Supreme Court did not adopt a bright-line rule for determining whether law enforcement officials have satisfied this standard. But the Court did provide guidance on the issue by explaining that the police "fail[] to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Id.* at 105-06 (brackets added). Factors favoring a finding that the police have scrupulously honored a defendant's rights include where "[1] the police . . . immediately ceased the interrogation, resumed questioning only after [2] the passage of a significant period of time and the provision of a fresh set of warnings, and [3] restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." *Id.* at 106 (brackets added). *Mosley* "neither elevates any one factor as predominant or dispositive nor suggests that the enumerated factors are exhaustive, but instead directs courts to focus on whether the confession 'was obtained in a manner compatible with the requirements of the Constitution.'" *United States v. Schwensow*, 151 F.3d 650, 659 (7th Cir. 1998) (quoting *Miller v. Fenton*, 474 U.S. 104, 112 (1985)).

In holding that Fleming's confession was admissible under *Mosley*, the Michigan Court of Appeals emphasized that there was no evidence indicating that the police endeavored to "wear down [Fleming's] resistance and make him change his mind." *See*

*Mosley* 423 U.S. at 105.   Although Fleming confessed before receiving a fresh set of *Miranda* warnings, the Michigan court's conclusion was premised upon its finding that the police did not actually interrogate Fleming a second time before he voluntarily chose to confess.

But the district court disagreed.   In contrast to the state court's opinion, which emphasized that the police officers did nothing to "wear down" Fleming's resistance, the district court emphasized other *Mosley* factors.  The district court did not think that the police waited long enough before "questioning" Fleming a second time about the murder (even though the purported questioning of Fleming by Officer Clayton occurred three hours later). It also observed that Fleming did not receive fresh *Miranda* warnings before Clayton made his comment that Fleming should "do the right thing," or before Clayton allegedly told Fleming to "get with the program" (which assumes, contrary to the reasonable determination of the Michigan Court of Appeals, that these comments constituted an "interrogation" that should have been accompanied with new warnings).   The district court noted that the purported interrogation concerned the same crime that was the subject of the earlier interrogation (a factor that indeed favors Fleming under *Mosley*).   Its application of these factors led the district court to conclude that the Michigan Court of Appeals unreasonably applied *Mosley*.

In conducting its analysis under *Mosley*, the district court apparently assumed that Detective Lesneski did not encourage Fleming to cooperate.  The district court's opinion in fact contains no discussion of Lesneski's alleged comments.   Nor did Fleming seek to resolve the factual dispute by requesting a hearing on the matter.  *See* 28 U.S.C. § 2254(e) (stating the conditions under which federal courts are permitted to hold hearings on factual disputes in state-court habeas proceedings).

In addition to assuming that Officer Clayton interrogated Fleming a second time before Fleming voluntarily confessed, and that Detective Lesneski did not encourage Fleming to cooperate, the district court failed to explain why the state court's ultimate conclusion—that the officers scrupulously honored Fleming's right to remain silent where there was no evidence that they tried to "wear down" Fleming's resistance—was contrary to *Mosley*.   As previously noted, "*Mosley* neither elevates any one factor as predominant or

dispositive nor suggests that the enumerated factors are exhaustive, but instead directs courts to focus on whether the confession 'was obtained in a manner compatible with the requirements of the Constitution.'" *Schwensow*, 151 F.3d at 659 (quoting *Miller*, 474 U.S. at 112). Even Fleming concedes that *Mosley* does not provide a per se rule for determining whether the police have sufficiently honored the suspect's exercise of his right to remain silent, and that *Mosley* does not require in every case the passage of a fixed length of time, the provision of fresh *Miranda* warnings, or a change of subject.

The fact that the district court reached a contrary outcome after emphasizing different *Mosley* factors than those relied on by the Michigan Court of Appeals does not suffice to justify the granting of a habeas petition pursuant to AEDPA, especially in light of our conclusion that the state court's determination regarding a lack of interrogation by Officer Clayton was not objectively unreasonable. *See Hereford*, 536 F.3d at 528. In sum, despite the closeness of the question on the merits, we are of the opinion that the Michigan Court of Appeals's decision on this issue was not an unreasonable application of *Miranda*, *Innis*, or *Mosley*.

Our dissenting colleague, on the other hand, believes that the Michigan Court of Appeals's plain-error review of the claim is not entitled to AEDPA deference because such a review does not amount to consideration 'on the merits' for purposes of 28 U.S.C. § 2254(d). We respectfully disagree for two reasons.

First, none of the cases cited by the dissent decide the question of whether a claim reviewed for plain error by a state court dispenses with our obligation to apply AEDPA deference to the merits of the decision reached by that court. They instead discuss the analytically prior question of whether a federal court is permitted to hear an issue in the first place under the doctrine of procedural default. *See, e.g.*, *Jells v. Mitchell*, 538 F.3d 478, 511 (6th Cir. 2008) (holding that a claim not raised before the Ohio Court of Appeals was procedurally defaulted even though the Ohio Supreme Court reviewed the claim for plain error on direct appeal); *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006) (holding that "a state court's plain error analysis does not save a petitioner from procedural default"); *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) (holding that habeas petitioners cannot resurrect procedurally defaulted claims on the sole basis that a state court has applied

plain-error review to the issue on direct appeal).  We of course agree with these cases to the extent that they stand for the well-established rule that a state court's application of plain-error review does not revive a habeas petitioner's otherwise procedurally defaulted claim on collateral review.  But we disagree with our colleague's view that they control not only this court's ability to address a habeas petitioner's claim, but also the appropriate standard of review to apply once we have determined that the claim is reviewable on the merits.

Second, the question of whether a claim should be addressed on collateral review under the judicially created doctrine of procedural default is independent of the question of whether Congress requires deference pursuant to AEDPA.  This court declines to review procedurally defaulted claims out of respect for state-court enforcement of state procedural rules.  *Clinkscale v. Carter*, 375 F.3d 430, 441 (6th Cir. 2004) (citing *Coleman v. Thompson*, 501 U.S. 722, 722 (1991)) (observing that the purposes of the procedural-default rule include concerns of comity and federalism).  Similarly, Congress enacted AEDPA "to further the principles of comity, finality, and federalism."  *Williams v. Taylor*, 529 U.S. 420, 436 (2000).  But the fact that similar concerns motivate both the procedural-default doctrine and AEDPA does not permit us to ignore the latter simply because the former doctrine is deemed inapplicable.  Instead, we believe that this court's jurisprudence is reasonably clear about when a state-court's consideration of a claim is to be considered "adjudicated on the merits" for the purpose of triggering our review under AEDPA.  *See* 28 U.S.C. § 2254(d).

This court's decisions in *Maples v. Stegall*, 340 F.3d 433 (6th Cir. 2003), and *Danner v. Motley*, 448 F.3d 372 (6th Cir. 2006), are instructive on this point.  In *Maples*, this court followed the Supreme Court's lead in *Wiggins v. Smith*, 539 U.S. 510 (2003), in holding that, to the extent that no state court had decided the claim in question, the claim would be subject to de novo review.  *Maples*, 340 F.3d at 437.  AEDPA deference was deemed inappropriate in *Maples* because the Michigan courts simply declined to evaluate the merits of the petitioner's federal ineffective-assistance-of-counsel claim at all.  *See id.* at 435-36; *see also People v. Maples*, No. 196975, 1997 WL 33339368, *1 (Mich. Ct. App. Nov. 4, 1997), *aff'd*, *People v. Maples,* 584 N.W.2d 738 (Mich. 1998).

In the total absence of any such evaluation, there was no need in *Maples* to specify the precise form of analysis would suffice to constitute an adjudication on the merits of a

claim under AEDPA. *See Maples*, 340 F.3d at 437. But *Danner*, 448 F.3d at 376, provides further clues, indicating that federal courts will not apply AEDPA deference to a state court's adjudication if the state court "confined its analysis . . . to state law" or failed to examine applicable constitutional law. *Id*. Both *Maples* and *Danner* therefore focus on the legal reasoning provided by the state court in disposing of a claim to determine whether AEDPA applies—not the standard of review through which that claim is viewed. And both clearly imply that AEDPA deference would apply if the state court conducts any reasoned elaboration of an issue under federal law.

This court's decision in *Benge v. Johnson*, 474 F.3d 236 (6th Cir. 2007), is not to the contrary. In *Benge*, a jury instruction was held to be erroneous under state law, but not plainly so, by the Ohio Supreme Court. *Id.* at 245-46. On that basis the state appellate court declined to reverse the defendant's conviction. *Id*. The habeas petitioner claimed, on collateral review, that his counsel was constitutionally ineffective for failing to object to the instruction during trial. *Id.* at 246. This court reviewed the ineffective-assistance claim de novo because the question of whether the jury instruction was plainly erroneous, as determined by the Ohio Supreme Court under purely state law, could not serve as a substitute for the entirely different inquiry of whether the petitioner's trial counsel had been constitutionally ineffective for failing to object to the instruction in the first place. *See id*. But *Benge* does not demonstrate, as the dissent suggests, that the state court's application of plain-error review *per se* insulates the claim from AEDPA deference. Instead, this court declined to defer in *Benge* because the state court did not provide a "reasoned adjudication" of the federal ineffective-assistance-of-counsel claim at issue. *See id.* at 247.

The case before us is not like *Benge* or *Maples*. There is little question that Fleming's Fifth Amendment claim was "adjudicated on the merits" for AEDPA purposes by the Michigan Court of Appeals. We note as an initial matter that Fleming has never contested AEDPA's applicability. This issue has instead been raised *sua sponte* by our dissenting colleague. Moreover, the Michigan Court of Appeals analyzed Fleming's claim pursuant to *Mosley*'s "scrupulously honored" standard, as amply indicated by the above discussion of the Michigan court's opinion. Its use of the plain-error standard of review, as opposed to the clearly erroneous or de novo standards, simply made reversal of the state trial

court's judgment less likely, but did not cause the Michigan Court of Appeals to bypass the merits of Fleming's claim and thereby avoid triggering AEDPA deference.

Nor are we persuaded by our dissenting colleague's distinction between federal constitutional issues that a state court "merely addresses" on the merits and those that are "'adjudicated' on the merits." (Dissenting Op. p. 25) This appears to us to be a distinction without a difference. *See Dando v. Yukins*, 461 F.3d 791, 796 (6th Cir. 2006) ("Where a state court fails to address federal law, § 2254 does not apply, and the decision is reviewed de novo," which clearly implies that AEDPA deference *would have applied* if the state court had *addressed* the claim). Furthermore, the first step of the Michigan Court of Appeals's plain-error review essentially required addressing whether an error had occurred—an inquiry which, in this case, could not be accomplished without first adjudicating the merits of Fleming's claim. This is not a case where the state court simply assumed, without deciding, that there was a constitutional error and then proceeded to determine that the error was not plain. To the contrary, the case before us is one where plain-error review itself played no practical role in the resolution of Fleming's Fifth Amendment claim at the state level.

The heart of the disagreement between ourselves and our dissenting colleague thus boils down to whether a federal constitutional claim reviewed by a state court for "plain error" can be considered "adjudicated on the merits" for the purpose of receiving deference under AEDPA. To our knowledge, there is no authority squarely on point that decides this key question. We are persuaded, however, that we would be acting contrary to Congress's intent to have AEDPA "further the principles of comity, finality, and federalism," *Williams*, 529 U.S. at 436, if we simply ignored the Michigan Court of Appeals's evaluation of Fleming's Fifth Amendment claim by reconsidering the issue de novo. In sum, we see no inherent contradiction in applying AEDPA deference to the Michigan Court of Appeals's reasoning on the merits of Fleming's claim despite our disagreement with its ruling that the issue was procedurally defaulted. The state court's substantive reasoning does not simply vanish along with its erroneous procedural-default determination. Nor does AEDPA.

We therefore believe that the dissent's de novo analysis of Fleming's Fifth Amendment claim is inappropriate, and we further disagree with its conclusory statements to the effect that Officer Clayton's brief comments (or even Detective Lesneski's alleged

encouragement to cooperate) "demonstrate a persistent and not-so-subtle effort to persuade Fleming to discuss the homicide." (Dissenting Op. at 49) The facts before us are simply far removed from cases like *Thompkins v. Berghuis*, 547 F.3d 572 (6th Cir. 2008), where the police were found to have engaged in an interrogation that failed to scrupulously honor the suspect's *Miranda* rights. *See id.* at 574-75, 586-88 (granting habeas where the police officers questioned the petitioner continuously for nearly three hours, and where the interrogation was "very, very one-sided"). We have already discussed why Officer Clayton's comments came nowhere close to that characterization.

Detective Lesneski's alleged comments are similarly not inconsistent with *Mosley*, a case that provides no set formula for determining whether the police have scrupulously honored a suspect's right to remain silent. *See Mosley*, 423 U.S. at 104. *Mosley* permits the police, as Fleming acknowledges in his brief, to present new information to a suspect so that he is able "to make informed and intelligent assessments of [his] interests." *See id.* at 102. Detective Lesneski's alleged comments did precisely this: he disclosed to Fleming that the police had discovered a weapon on the premises, which permitted Fleming to reassess his situation. True, Lesneski's alleged comments included a suggestion to "cooperate." But this suggestion was accompanied by—again, according to Fleming himself—a warning to Fleming "to be careful" about what he said, and a caution not to say anything about which he would be "sorry." No doubt a complete and fresh recitation of the *Miranda* warnings would have been preferable to these shorthand reminders. But in the context of this case, where there is no dispute that Fleming fully understood his *Miranda* rights, such cautionary language bolsters the view that those rights were scrupulously honored under *Mosley*.

**C.     Fleming's constitutional right to present a defense**

We now turn to Fleming's alternative habeas claim regarding the exclusion of Scott Fowler's testimony as a defense witness. The state trial court expressly refused to consider Fleming's Sixth and Fourteenth Amendment claims relating to his right to mount a defense because it considered the issue to be one of state evidentiary law. We therefore review de novo Fleming's right-to-present-a-defense claim. *See Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006) (utilizing the de novo standard of review where the state court failed to consider the habeas petitioner's constitutional claim).

### 1.      *Relevant state and federal court proceedings*

At trial, Fleming presented evidence showing that he killed York in self defense. Michigan law required Fleming to show that he honestly and reasonably believed that he was in danger of serious bodily harm or death at the hands of York. *See People v. Helfin*, 456 N.W.2d 10, 18 (Mich. 1990). Fleming testified that he believed York was going to kill him because York had previously bragged about robbing drug dealers. He also called two witnesses who stated that York had a reputation for violence.

Fleming further tendered Fowler as a witness because Fowler allegedly saw York rob a crack cocaine dealer the week before York's murder. The Michigan trial court refused to allow Fowler to testify because the court deemed the evidence to be irrelevant, or so nearly irrelevant that, under Rule 403 of the Michigan Rules of Evidence, the prejudicial effect of such evidence substantially outweighed its probative value. On appeal, the Michigan Court of Appeals affirmed the judgment of the state trial court because it agreed that the testimony of the excluded witness was likely irrelevant. The state appellate court held that the witness's testimony would not have been relevant to Fleming's self-defense theory because "[i]f evidence is used to show the defendant's state of mind and support his apprehensions, the defendant must have known of the evidence." *See People v. Harris*, 583 N.W.2d 680, 683-84 (Mich. 1998). But there was no evidence in the record that Fleming's alleged apprehension of York was based on anyone's having witnessed York rob a drug dealer in the past. In fact, Fleming testified that, at the time of the incident, he did not know anything about York's propensity for violence. The state appellate court therefore found that "to whatever extent [Fleming] had knowledge of [York's] prior conduct, it was not based whatsoever on the excluded evidence." Such evidence was thus excluded because it was deemed irrelevant to establishing Fleming's state of mind before York's death.

To the extent that the witness's testimony served to establish character evidence of York's propensity for violence, the Michigan Court of Appeals also held that such testimony would only have been allowed in the form of "testimony as to reputation or by testimony in the form of an opinion." *See* Mich. R. Evid. 404(a)(2) and 405(a). The state appellate court noted, moreover, that Fleming had already presented the testimony of two witnesses

regarding York's reputation for violence. This led the Michigan Court of Appeals to conclude that the trial court had not abused its discretion.

The federal district court took issue with the Michigan Court of Appeals's "failure . . . to recognize the Constitutional dimension of the [trial court's] error," and considered this purported error to be "an unreasonable application of federal law." Quoting *Taylor v. Illinois*, 484 U.S. 400, 409 (1988), the court observed that "[t]he right to offer testimony is . . . grounded in the Sixth Amendment even though it is not expressly described in so many words."

### 2.      *Merits of the claim*

Fleming argues that the Michigan trial court erred in excluding Fowler's testimony on the basis of relevancy. And even if the court did not err as a matter of state law, Fleming maintains that the exclusion nonetheless violated his constitutional right to present witnesses in his own defense. The district court agreed. We respectfully disagree.

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense, including the right to present relevant evidence . . . subject to reasonable restrictions." *Varner v. Stovall*, 500 F.3d 491, 499 (6th Cir. 2007) (citations and internal quotation marks omitted) (alterations in original). This court, however, has also stated that "[i]t is well settled that the Constitution does not guarantee a defendant the opportunity to present *any* evidence he desires." *Alley v. Bell*, 307 F.3d 380, 396 (6th Cir. 2002). Indeed, "[o]nly if an evidentiary ruling is so egregious that it results in a denial of fundamental fairness [does] it . . . violate due process and thus warrant habeas relief." *Baze v. Parker*, 371 F.3d 310, 324 (6th Cir. 2004) (internal quotation marks omitted) (alterations in original). Issues of state law, however, are ordinarily not properly subjected to collateral review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Fleming argues that the Michigan trial court erred in finding that Fowler's testimony was irrelevant and duplicative. As to relevancy, Fowler would have testified that he had

previously witnessed York rob a drug dealer. This testimony was intended to bolster Fleming's specific account of what happened immediately before he shot York. In particular, if the jury was more likely to believe, due to Fowler's testimony, that York tried to rob Fleming, then the jury might have in turn believed that Fleming feared a serious risk of bodily injury at the hands of York. Absent Fowler's testimony, however, the jury was more likely to conclude that Fleming just made up the whole thing. Fowler's testimony is therefore arguably relevant to Fleming's self-defense claim.

Fleming also contends that Fowler's testimony did not duplicate the testimony of the two witnesses who testified that York was prone to violence. Instead, Fowler's testimony would have arguably added credibility to Fleming's account of the specific events leading up to York's death. Fleming contends that the Michigan Court of Appeals therefore erred in excluding Fowler's testimony.

Despite the initial plausibility of these arguments, they essentially address issues of Michigan evidentiary law that are not as such subject to collateral review. *See Estelle*, 502 U.S. at 67-68. Fleming therefore faces an uphill battle in characterizing his evidentiary concerns as constitutional in nature. In particular, Fleming must show that the state trial court's evidentiary ruling was "so egregious" that it effectively denied Fleming a fair trial. *See Baze*, 371 F.3d at 324. Fleming has not met this burden.

In support of his contention that the state trial court's evidentiary ruling raises constitutional concerns, Fleming cites two cases: *Chambers v. Mississippi*, 410 U.S. 284 (1973), and *Washington v. Texas*, 388 U.S.14 (1967). Fleming argues that these cases support the proposition that "[t]he right to present a defense is so fundamental that defense evidence must sometimes be allowed even though it technically violates an evidentiary rule." Even assuming the accuracy of this broad proposition, neither case supports Fleming's conclusion that the trial court's ruling violated his constitutional rights.

In *Chambers*, the state trial court permitted the defendant, who was accused of murder, to call as a witness someone who initially confessed to the murder but later repudiated his own confession and claimed to have an alibi. *Id.* at 291. But the defendant was "denied an opportunity to subject [the witness's] damning repudiation and alibi to cross-examination" based on the state court's rigid application of the so-called "voucher

rule" that prevents a party from impeaching the credibility of his own witness. *Id*. at 295-98. The trial court also refused to allow other witnesses to testify that they had heard someone else confess to the murder because the court concluded that such testimony would be inadmissible hearsay. *Id.* at 298. These two factors together were held to constitute reversible error on habeas corpus review. *Id.* at 302.

*Washington v. Texas* involved an eyewitness to a shooting who was excluded as a defense witness because he was allegedly an accomplice to the same shooting. In concluding that this witness was unconstitutionally excluded, the Supreme Court directed its attention to the nature of the evidentiary rule the state court used to exclude the witness:

> The rule disqualifying an alleged accomplice from testifying on behalf of the defendant cannot even be defended on the ground that it rationally sets apart a group of persons who are particularly likely to commit perjury. The absurdity of the rule is amply demonstrated by the exceptions that have been made to it.

*Washington*, 388 U.S. at 22. As a result, the Supreme Court held that

> the petitioner . . . was denied his right to have compulsory process for obtaining witnesses in his favor because the State arbitrarily denied him the right to put on the stand a witness who was physically and mentally capable of testifying to events that he had personally observed, and whose testimony would have been relevant and material to the defense.

*Id*. at 23.

The evidentiary rulings in *Chambers* and *Washington* are simply not on par with the exclusion at issue here. Unlike the witnesses who were excluded in *Chambers*, Fowler was not prepared to testify that he had overheard someone claiming to have seen York's killing. Nor was Fowler himself an eyewitness at the scene. Finally, the Michigan trial court did not rely on an evidentiary rule that irrationally excludes an entire category of witnesses from testifying on behalf of defendants, as in *Washington*.

Fleming might have had a stronger claim if, for example, he had been completely barred from presenting any witnesses to corroborate his contention that York was known to be violent. But that is not the case here. Fleming has failed to provide any persuasive reason why the Michigan trial court's evidentiary ruling was "so egregious that it results in a denial of fundamental fairness . . . and thus warrant[s] habeas relief." *See Baze*, 371 F.3d at 324.

The district court therefore erred in granting Fleming's petition for a writ of habeas corpus on the basis of a purported violation of his right to present a defense.

### 3.     *Harmless error*

Moreover, even if the state trial court's ruling had violated Fleming's constitutional right to present a defense, that constitutional error would be harmless. To determine whether an error is harmless on collateral review, "we ask whether the error 'had [a] substantial and injurious effect or influence in determining the jury's verdict.'" *Hereford v. Warren*, 536 F.3d 523, 528 (6th Cir. 2008) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

The district court held that the purportedly unconstitutional exclusion of Fowler's testimony was not harmless because the exclusion "allowed the prosecutor to argue [that Fleming's] testimony of fear of Scott York was not corroborated." We respectfully disagree with the district court's analysis because there is no indication that barring Fowler had a substantial and injurious effect on the jury's finding that Fleming was guilty. As the Michigan Court of Appeals observed:

> [D]efendant's testimony was damaging to his claim of self-defense, suggesting that, even if the proposed testimony was erroneously excluded, the error was harmless. For example, defendant testified that he had an opportunity to drive "probably sixty yards" away from the victim, before turning around to attempt to pacify the victim. Moreover, defendant['s] testimony[] established that the victim approached him menacingly at a "steady walk"; however, defendant testified that he had sufficient time to retrieve his shotgun from his truck, load the shotgun with bullets that were in his pocket, and then warn the victim to stop at least twice before shooting him. Although defendant claimed that the shooting was "self-defense," he testified that he shot the victim twice. Further, defendant testified that the victim was not armed with any weapons as he approached the defendant; nevertheless, defendant testified that he shot the victim in the face and head. In light of the defendant's testimony, we believe that there was an ample basis for the jury to conclude that defendant's use of deadly force was unreasonable, regardless of the victim's history of robbing crack dealers or defendant's honest belief that those stories were true.

The district court simply failed to consider the Michigan Court of Appeals's harmless-error analysis, an analysis that we find persuasive. We would elaborate on only one detail. Not only was York shot twice, but one of those shots entered York's skull in the back of his head. A reasonable jury could easily conclude that shooting someone in the back

of the head is inconsistent with a claim of self defense.  In sum, even if excluding Fowler as a witness was a constitutional error, it was a harmless one because there is no indication that the error had a substantial and injurious effect or influence in determining the jury's verdict.

### III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case with instructions to deny Fleming's petition for a writ of habeas corpus.

_____

**CONCURRING IN PART, DISSENTING IN PART**

_____

CLAY, Circuit Judge, concurring in part and dissenting in part. Respondent Linda Metrish, Warden of Michigan's Kinross Correctional Facility, appeals from the district court's judgment granting Petitioner Stephen Fleming's application for a writ of habeas corpus under 28 U.S.C. § 2254. In his habeas petition, Fleming challenges his convictions for second-degree murder and possession of a firearm during the commission of a felony on the grounds that: (1) the trial court should have excluded his confession under *Michigan v. Mosley*, 423 U.S. 96 (1975), because the police failed to "scrupulously honor" his assertion of his Fifth Amendment right against self-incrimination; and (2) the trial court's exclusion of certain witness testimony denied him his fundamental right to present a defense. The district court conditionally granted habeas relief on both claims.

Although I concur in the majority's holding that the district court improperly granted Fleming habeas relief on his claim regarding the exclusion of Fowler's testimony, I respectfully dissent from the majority's conclusion regarding Fleming's *Mosley* claim. When considered in context, the numerous exhortations by the police encouraging Fleming to "get with the program" and "cooperate" rose above the level of mere admonition. At the time, Fleming was handcuffed in a police vehicle, and police officers were celebrating the discovery of the murder weapon right in front of him, allegedly shouting and pointing in his direction. Although Fleming made clear that he did not want to answer questions related to the homicide, the record indicates that the police repeatedly pressured him to "do the right thing" and "get with the program," comments plainly aimed at wearing down Fleming's resistance to questioning. In other words, despite Fleming's prior invocation of his right to remain silent, the officers at the scene failed to "*scrupulously* honor" his decision to cut off questioning.

**I.**

Although acknowledging that there are "strong arguments" on both sides, the majority reverses the district court's ruling with respect to Fleming's *Mosley* claim based primarily on its conclusion that the deferential standard of review required under AEDPA applies. By its very terms, however, AEDPA applies only to "any claim that was *adjudicated on the merits* in State court proceedings." 28 U.S.C. § 2254(d) (emphasis added); *see Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006). AEDPA thus requires deference only where the defendant's federal claim was "adjudicated" on the merits, not, more broadly speaking, whenever a state court merely addresses—or, in the parlance of the majority, "evaluates"—the merits of the claim. Conversely, where the state courts do not rule on the merits of a claim, this Court reviews the claim *de novo*. *See Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply. Instead, this court reviews questions of law and mixed questions of law and fact *de novo*." (internal citation omitted)). Because the Michigan courts reviewed Fleming's claim for plain error only, the majority's conclusion that the decision of the Michigan Court of Appeals, nevertheless, is entitled to deference under AEDPA is improper. In fact, the majority's insistence on deference is, under the circumstances, contrary to controlling authority, illogical, and manifestly unjust. Having properly raised his *Mosley* claim before the trial court, and pressed that claim at every stage of his state court proceedings, Fleming is entitled to a full review of the merits of his claim.

Because it concluded that Fleming had "forfeited" his *Mosley* claim, the Michigan Court of Appeals did not rule on the merits of that claim, but instead reviewed the claim for plain error only. *People v. Fleming*, No. 228731, 2002 WL 988568, at *1 (Mich. Ct. App. May 14, 2002) (per curiam). Under the plain-error framework, Fleming was required to show not only that the police failed to honor his decision to remain silent, but also that the trial court's error was "plain" and affected his "substantial rights." *Id.*; *see also Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008) (describing petitioner's burden under the plain-error standard). Regardless of whether the Michigan Court of Appeals explored some aspects of the merits of Fleming's *Mosley* claim in conducting its inquiry, it is undeniable that the court did not consider the merits of Fleming's claim outside the context of its plain-

error inquiry. Indeed, the Michigan Court of Appeals made clear that, even had Fleming satisfied the requisite elements of the plain-error inquiry, reversal would be "warranted" only if he also could show that "the plain, forfeited error . . . seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Fleming*, 2002 WL 988568, at \*1; *see also Cristini*, 526 F.3d at 901 ("If all three [plain-error] conditions are met, we may then exercise our discretion to notice a forfeited error, but only if . . . the error seriously affected the fairness, integrity or public reputation of the judicial proceedings." (citing *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007)). The Michigan court's application of the plain-error standard thus placed significant burdens on Fleming that he otherwise would not have had to bear to establish a violation under *Mosley*. *See Benge v. Johnson*, 474 F.3d 236, 246 (6th Cir. 2007) (recognizing that it was "less burdensome" for petitioner to satisfy the elements of his *Strickland* claim than to demonstrate plain error); *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003) (noting that the plain-error standard of review is "a highly deferential standard, to put it mildly").

Under these circumstances, the controlling rule in this circuit is that AEDPA does not apply and the claim is reviewed *de novo*. In the habeas context, this Court does not construe a state court's plain-error review as negating the determination that a claim has been procedurally defaulted. *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) ("Controlling precedent in our circuit indicates that plain error review does not constitute a waiver of state procedural default rules."); *Paprocki v. Foltz*, 869 F.2d 281, 285 (6th Cir. 1989) ("We would be loath to adopt an exception to the 'cause and prejudice' rule that would discourage state appellate courts from undertaking the sort of [manifest injustice] inquiry conducted by the Michigan court, and we do not believe that the state court's explanation of why the jury instructions resulted in no manifest injustice can fairly be said to have constituted a waiver of the procedural default."). Rather, we "view a state appellate court's review for plain error as the enforcement of a procedural default."[1] *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *see also Keith v. Mitchell*, 455 F.3d 662, 673-

---

[1]The Michigan court's "safety valve" review for plain error is not unique. "Many states have procedural default rules with similar 'safety valves' for situations in which enforcing the procedural default would work a serious injustice." *Campbell v. Burris*, 515 F.3d 172, 178 (3rd Cir. 2008) (citing *Neal v. Gramley*, 99 F.3d 841, 844 (7th Cir. 1996)).

74 (6th Cir. 2006). For that reason, this Court does not construe a state court's plain-error review as an adjudication "on the merits" for purposes of § 2254.**2** *See, e.g.*, *Thompkins v. Berghuis*, 547 F.3d 572, 590 (6th Cir. 2008) (affording no deference to state court's plain-error review of petitioner's prosecutorial-misconduct claim); *Jells v. Mitchell*, 538 F.3d 478, 511 (6th Cir. 2008) ("The [state] court's plain-error review is not considered a review on the merits . . . ."); *Benge*, 474 F.3d at 246 (expressly applying *de novo* review to prejudice prong of *Strickland* claim where state court reviewed claim for plain error); *see also Grayer v. McKee*, 149 F. App'x 435, 442 (6th Cir. 2005) (rejecting district court's conclusion that state court's plain-error analysis constituted a review of the merits of petitioner's claim).

As these cases demonstrate, the controlling rule in this circuit is that no deference is due under AEDPA where a state court reviews a petitioner's habeas claim for plain error only, regardless of whether the court's plain-error inquiry may have delved into the merits of the claim.**3** As this Court expressly and unequivocally held in *Lundgren v. Mitchell*, 440 F.3d 754 (6th Cir. 2006), a state court's plain-error review is not due deference under AEDPA because "[p]lain error analysis is more properly viewed as a court's right to overlook procedural defects to prevent manifest injustice, but *is not equivalent to a review of the merits*." *Id.* at 765 (emphasis added). Accordingly, where the state courts determine that a claim has been forfeited and thus review that claim for plain error only, AEDPA does not apply and no deference is due. Rather, we are free to exercise our independent judgment and review the claim *de novo*.

---

**2**The majority argues that all of our cases holding that AEDPA deference does not apply in this context resolved only the "analytically prior question of whether a federal court is permitted to hear an issue in the first place[, or whether we are precluded from addressing the claim] under the doctrine of procedural default." Contrary to the majority's argument, although each of these decisions obviously addressed the default issue, even a cursory review demonstrates that they also proceeded to resolve what standard of review applies in this context.

**3**In *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003), the Tenth Circuit surveyed the various approaches that the Courts of Appeals have adopted regarding this issue, concluding that there is a split among the circuits and, significantly, identifying this Court as construing a state court's plain-error review as an application of state procedural default rules rather than an adjudication on the merits. *Id.* at 1205 n.7 (citing *Hinkle*, 271 F.3d at 244).

Even if one were to ignore this litany of cases and accept the majority's flawed contention that "there is no authority squarely on point that decides this key question," the express language of AEDPA requires deference *only* where a defendant's federal claim has been "adjudicated" on the merits. 28 U.S.C. § 2254(d). Nothing in AEDPA even remotely suggests that deference is required more broadly where a state court merely addresses merits-related aspects of a defendant's federal claim. Consequently, because the Michigan courts resolved Fleming's *Mosley* claim on the basis of a state procedural rule—and, in fact, did so improperly—the "principles of comity, finality, and federalism" noted in *Williams v. Taylor*, 529 U.S. 420, 436 (2000), are not implicated here.[4]

Today's decision marks an extraordinary and unjustified departure from that controlling rule. In fact, to justify its conclusion, the majority goes to great lengths to distinguish and cabin the holding of *Benge* and this Court's other cases declining to defer to a state court's plain-error inquiry, but those efforts are unpersuasive. Contrary to the majority's suggestion, nothing in *Benge* indicates that it is relevant whether the state courts may have tangentially considered the merits of petitioner's claim in addressing the "error" element of the plain-error inquiry. Rather, the decision in *Benge* to review the defendant's claim *de novo* was based entirely on the determination that the state court's plain-error inquiry imposed additional burdens on the habeas petitioner. *See* 474 F.3d 246-47. As the *Benge* Court explained, AEDPA's mandate to defer to state court judgments "does not factor into [the] resolution" of the actual prejudice prong of the petitioner's *Strickland* claim because the Ohio Supreme Court had analyzed the claim "only in the context of plain error review, not under the governing – and less burdensome – *Strickland* standard." *Id.* at 246. In reaching that conclusion, the *Benge* Court reasoned that, "[b]ecause [the petitioner] could have met his burden under

---

[4]Underlying our decision in *Vasquez v. Jones*, 486 F.3d 135 (6th Cir. 2007), is the express recognition that a state court's consideration of a "claim" is distinct from its consideration of an "issue" relevant to that claim. *Id.* at 141. If, according to *Vasquez*, only "modified AEDPA deference" is required where a state court undoubtedly "adjudicated the claim [on the merits,] but with little analysis on the substantive constitutional issue," *id.*, then there is even less justification to apply full AEDPA deference, as the majority does here, where the state court adjudicated and resolved the federal claim on state procedural grounds and merely addressed merits-related issues in the course of that discussion.

*Strickland* despite not being able to demonstrate plain error, this analysis did not constitute an 'adjudication on the merits' of [his] ineffective-assistance-of-counsel claims." *Id.* Nothing in *Benge* suggests that the Court's ruling was affected by whether any merits-related issues may have fallen within the scope of the state court's plain-error inquiry.

According to the majority, *Benge* does not control here because, in Fleming's case, the state court's "use of the plain-error standard of review . . . simply made reversal of the state trial court's judgment less likely, but did not cause the Michigan Court of Appeals to bypass the merits of Fleming's claim and thereby avoid triggering AEDPA deference." The majority's reasoning simply cannot be squared with *Benge*, where the Court declined to defer to a state court's plain-error inquiry precisely because that standard made the defendant's showing more "burdensome," 474 F.3d at 246, a conclusion which seems indistinguishable from the majority's conclusion that Fleming's chance of success under the plain-error standard was "less likely."

Nor can the majority's position be reconciled with the holding of *Lundgren* that a state court's plain-error review, even though it may require the court to explore certain aspects of the merits of the claim, "is *not equivalent* to a review of the merits." 440 F.3d at 765 (emphasis added). Indeed, as our sister circuits have recognized, "[t]o decide whether an error is plain requires consideration of the merits—but only so far as may be required to determine that issue. It does not open up the merits any wider for consideration by the federal court."[5] *Neal*, 99 F.3d at 844; *see also Roy v. Coxon*, 907 F.2d 385, 390 (2d Cir. 1990) ("[E]ven if the state court has addressed the questions of (a) whether there was error, and (b) whether the error was prejudicial, if these questions were answered in the context of plain-error analysis, the decision was *not sufficiently a ruling on the merits* to authorize the federal court to reach the merits." (emphasis added)). Despite the majority's best efforts to distinguish *Benge* and *Lundgren*, the rule announced in those cases controls our review here. And those decisions dictate that

---

[5]It is important to stress that *de novo* review is appropriate here not because the Michigan Court of Appeals reviewed Fleming's claim for plain error, but rather because, unlike *Neal*, we have determined that the state court's procedural-default determination was in error.

deference is not required here, regardless of whether the state court considered some aspects of the merits of Fleming's claim in reviewing his claim for plain error.

The majority's position is inconsistent not only with the express holdings of *Benge* and *Lundgren*, but also with the logic underlying those decisions. In general, "a federal court may not consider a claim for habeas corpus relief if the claim was procedurally defaulted in state court." *Hargrave-Thomas v. Yukins*, 374 F.3d 383, 387 (6th Cir. 2004). There are exceptions, however. For instance, the federal courts may consider the merits of a claim that has been procedurally defaulted where the petitioner demonstrates "cause and prejudice." *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (noting that a petitioner can overcome procedural default by demonstrating "cause for the default and actual prejudice as a result of the alleged violation of federal law," or demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice"). The federal courts also may consider a purportedly defaulted claim where the state court's procedural-default determination was wrong as a matter of law. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986) (describing this circuit's four-part test for determining whether a claim in fact has been procedurally defaulted).

In the latter case, where a federal court finds error in the state court's procedural-default ruling, the federal courts are not bound by the state court's adjudication of the claim, even if the state court proceeded to review the claim for plain error or manifest injustice, or under any other "safety valve" standard. *See Campbell*, 515 F.3d at 178. And for good reason, because rejecting the state court's underlying default ruling necessarily implies that the state court's application of a more burdensome "safety valve" standard was improper. In light of such a determination, although it is true that the "state court's substantive reasoning does not simply vanish along with its erroneous procedural-default determination," as the majority quips, it is illogical to continue to insist on deferring to a state court's improperly-applied, and undoubtedly more burdensome, plain-error inquiry. *See Lundgren*, 440 F.3d at 765.

This interplay between a state court's default ruling and its application of plain-error review also undermines the majority's unsupported contention that "whether a

claim should be addressed on collateral review [or whether review is precluded] under the judicially created doctrine of procedural default is independent of the question whether Congress requires deference pursuant to AEDPA." If the federal courts have rejected the state court's "analytically prior" ruling that a claim has been procedurally defaulted, then there is no justification for the federal courts to be bound by the *effects* of that determination, *i.e.*, the application of a more burdensome safety valve standard. In fact, such a rule would be manifestly unjust as it would imply that a defendant who has properly raised a federal claim in state court is never afforded a full review of the merits of his claim at any stage. The majority's baseless contention that we are obliged to give deference to any state court adjudication where the state court "conducts *any* reasoned elaboration of an issue under federal law" thus is fundamentally unfair to criminal defendants who have properly raised their claims in state court, but, through no fault of their own, have never been afforded a full review of the merits of their claims.

The majority's insistence that deference is required whenever "the state court conducts *any* reasoned elaboration of an issue under federal law" also is in tension with other aspects of this Court's habeas jurisprudence. For instance, in *Joseph v. Coyle*, 469 F.3d 441 (6th Cir. 2006), we recognized an important exception to the deference owed state court adjudications under AEDPA, holding that *de novo* review is appropriate "when a claim made on federal habeas review is premised on *Brady* material that has surfaced for the first time during federal proceedings," even where the state courts ostensibly addressed that claim on the merits. *Id.* at 469. In such cases, we have construed the development of new evidence as giving rise, in effect, to a new claim, and thus have held that deference is not required under § 2254(d) in such cases. *Id.* In *Brown v. Smith*, 551 F.3d 424 (6th Cir. 2008), we expanded the scope of that exception, holding that the principle announced in *Joseph* "applies generally," not just in the context of *Brady* claims. *Id.* at 430 (applying *de novo* review to ineffective-assistance-of-counsel claim that had been addressed "on the merits" by the state courts).

Although the majority's insistence on deference in this case is not entirely irreconcilable with this line of cases, it seems more than a little awkward that *de novo*

review is appropriate where the state courts undeniably have addressed a petitioner's claim "on the merits" but improperly failed to consider critical evidence in conducting that inquiry, and yet deference is required where the state courts undoubtedly reviewed a claim for plain error only *and* we have rejected the state court's entire premise for applying that standard. Indeed, the majority's insistence on deference whenever the state courts conduct "any reasoned elaboration of an issue under federal law" is utterly inconsistent with the logic and interests underlying our application of *de novo* review in *Joseph* and *Brown*, both of which concluded that a state court's consideration of issues related to the merits of a defendant's claim does not require deference under AEDPA.

If, as the majority insists, the "principles of comity, finality, and federalism" identified in *Williams*, 529 U.S. at 436, were implicated not only where a state court *adjudicates* a claim on the merits, but whenever a state court decision merely *addresses* the merits of a defendant's claim, then application of *de novo* review in *Joseph* and *Brown* would be inconsistent with AEDPA. The Supreme Court, however, has assumed, without deciding, that deference under AEDPA is not required and that *de novo* review is appropriate in such cases. *See Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (noting that "some Courts of Appeals have conducted *de novo* review [in such cases] on the theory that there is no relevant state-court determination to which one could defer" and "assuming, *arguendo*, that this analysis is correct"); *see also Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002). This is not, as the majority suggests, merely a linguistic distinction without any substantive import. Rather, it is distinction dictated by the express terms of AEDPA, and one that is necessary to draw if we are to make cohesive sense of the numerous decisions by this Court and our sister circuits applying *de novo* review where a state court, despite addressing and evaluating the merits of a party's federal claim, has resolved the claim on the basis of state procedural default rules.

In this case, therefore, the majority's decision to reject the Michigan Court of Appeals' determination that Fleming forfeited his *Mosley* claim also negates the entire basis for subjecting that claim to plain-error review in the first place. It is beyond

dispute that the Michigan Court of Appeals' premise for reviewing Fleming's *Mosley* claim for plain error was that Fleming had forfeited the claim. *See Fleming*, 2002 WL 988568, at *1. Now that the majority has rejected that underlying default ruling, there no longer is any basis for limiting review of Fleming's claim to plain error. Our policy of providing an opportunity for state courts to correct constitutional errors before a petitioner may seek relief in federal court, *see Coleman*, 501 U.S. at 730-31, simply is not implicated under these circumstances. Thus, although—or, rather, *because*—I agree with the majority's determination that the Michigan Court of Appeals improperly found that Fleming had defaulted on his *Mosley* claim, I dispute the majority's conclusion that AEDPA's deferential standard of review continues to apply.

Absent *de novo* review by this Court, the merits of Fleming's *Mosley* claim will never have been fully considered by any court, state or federal, despite the majority's recognition that the claim was not procedurally defaulted. Such an outcome is particularly unjust in this case because, as the majority acknowledges, "were Fleming's appeal a direct one to be reviewed *de novo*, the possibility exists that we might have agreed with Fleming's position." Having properly raised his *Mosley* claim before the trial court and pressed that claim at every stage of his state court proceedings, Fleming is entitled to a full review of the merits of his claim. Fleming is entitled to *de novo* review.

For these reasons, I do not agree with my colleagues' analysis of Fleming's *Mosley* claim. At least until today, it seemed well-settled that a state court's plain-error review of a petitioner's habeas claim did not constitute an adjudication "on the merits" for purposes of 28 U.S.C. § 2254. In my opinion, that rule applies here and controls our review of Fleming's *Mosley* claim. Because the Michigan Court of Appeals reviewed Fleming's *Mosley* claim for plain error only, our review of that claim "is not circumscribed by a state court conclusion." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003). And because there is no state court adjudication to which we must defer, we are free to exercise our independent judgment and review Fleming's claim *de novo*. *See Maples*, 340 F.3d at 436.

**II.**

Applying *de novo* review, I conclude that Fleming's confession should not have been admitted at trial because the police ignored the rigid requirements of *Mosley* and failed to "*scrupulously* honor" Fleming's invocation of his right to remain silent.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court established certain procedural safeguards designed to protect the rights of a suspect, under the Fifth and Fourteenth Amendments, to be free from compelled self-incrimination during custodial interrogation. The Supreme Court specified, among other things, that if the suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation *must cease*." *Id.* at 473-74 (emphasis added). The Court reasoned that, at this point, the suspect "has shown that he intends to exercise his Fifth Amendment privilege," and thus "any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.* at 474.

Although not all statements obtained after a suspect invokes his or her right to remain silent are, as the majority puts it, "necessarily inadmissible in all cases," statements obtained after the suspect has decided to remain silent will be excluded where the suspect's "right to cut off questioning" was not "scrupulously honored." *Mosley*, 423 U.S. at 104. In determining whether the police "scrupulously honored" a suspect's invocation of the right to remain silent, we must inquire into "the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have the assistance of counsel." *Fare v. Michael C.*, 442 U.S. 707, 724-25 (1979).

In this case, the circumstances surrounding Fleming's interrogation make clear that the police did not "scrupulously honor" his decision to remain silent. On November 19, 1999, Detective Robert Lesneski and other officers executed a search warrant for Fleming's residence and surrounding curtilage. When the police arrived at his residence, Fleming initially was "very cooperative," and even volunteered that the police would find drugs (hashish) in a barn on his property. After locating the drugs,

Detective Lesneski contacted a narcotics team from anther jurisdiction to assist the search team in dealing with the drug evidence.

After securing the drugs, Detective Lesneski returned to speak with Fleming. Detective Lesneski testified that, although Fleming was "not in custody at that time," he nevertheless advised Fleming of his *Miranda* rights and asked Fleming if he would be willing to talk. Fleming responded that he did not want to talk about "that fucking homicide." A "short time later," Detective Lesneski placed Fleming under arrest based on the drug evidence collected, handcuffed him in front of his body with plastic hand ties, and placed him in the back seat of a Michigan State Police cruiser, under the watch of Trooper Devine.

Shortly thereafter, Detective Lesneski received a call informing him that the search team had located a shotgun in a nearby creek. Detective Lesneski immediately left the area where Fleming was being held to join the search team at that location. When he arrived, Detective Lesneski was informed that the search team had located a twelve-gauge shotgun wrapped in plastic and secured with duct tape. Detective Lesneski briefly examined the weapon and determined that it was a Remington pump-action shotgun, the same model as the weapon used to shoot the victim. Detective Lesneski then sent the weapon to the forensics lab for further processing.

Sometime after Detective Lesneski left Fleming's residence, Trooper Devine also decided to join the search team at the creek. Trooper Devine transferred Fleming to the front passenger seat of a narcotics van now at the scene, and asked Sergeant Robert Clayton, a narcotics officer with the Ogemaw County Sheriff's Department, to sit in the van and watch Fleming. Fleming remained in the van for several hours while the search of his residence and property continued, allegedly because the police lacked the personnel to transport Fleming to jail without interrupting the search. During that time, Sergeant Clayton and Fleming engaged in "small talk."

Approximately two hours after Fleming was transferred to Sergeant Clayton's custody, the search team returned from the creek. Believing that they had just located the murder weapon, the returning officers were visibly excited and began celebrating

their discovery. From his vantage point in the van, Fleming could see the celebration. Although Fleming could not hear what was being said outside the van, he testified that he observed Detective Lesneski gesturing toward him and believed Detective Lesneski to exclaim, "Hell, yeah, I got you!"

At this point, Sergeant Clayton told Fleming that things did not look good for him, and then stated that it would be in Fleming's "best interest" to "do the right thing." According to Fleming, Sergeant Clayton also warned: "If you have any chance at any thing, . . . I would [] strongly recommend that you get with the program." When he testified about this particular moment, Fleming stated that he felt like "a whole garage full of police officers" was "staring" at him, and he became very "concerned, upset, [and] nervous." Almost immediately thereafter, Sergeant Clayton asked Fleming if he wanted to speak with Detective Lesneski. Fleming relented and agreed to speak with Detective Lesneski.

A few minutes later, Sergeant Clayton informed Detective Lesneski that Fleming wished to speak with him. A few more minutes passed before Detective Lesneski walked over to the van, excused Sergeant Clayton, and sat down with Fleming. Fleming recalled that he was very upset at the time, and began feeling nauseous, "like he had to vomit." Fleming acknowledges that Detective Lesneski was very accommodating, and "pulled the van up" so that the other officers would not see Fleming crying. Detective Lesneski also agreed to open a window or door to give Fleming some air.

Detective Lesneski testified that, after being summoned to the van by Sergeant Clayton, he did not ask Fleming "any questions or begin interrogation at all." In fact, Detective Lesneski claims that he did not "sa[y] anything at all to [Fleming] prior to him speaking out on these issues." Rather, according to Detective Lesneski, Fleming voluntarily proceeded to make several incriminating statements, ultimately confessing that he shot and killed Scott York with the shotgun that the police had just found.

Fleming disputes Detective Lesneski's version of events, especially with respect to one crucial issue. Fleming claims that, before he made any incriminating statements, Detective Lesneski stated that he was confident he had just found the murder weapon,

and warned Fleming that "it [would] be within [Fleming's] best interests to cooperate." At this point, Fleming relented and began talking to Detective Lesneski.

Rather than advising Fleming of his *Miranda* rights at this point, Detective Lesneski waited until Fleming had confessed before interrupting him to remind him of his rights. According to Detective Lesneski, after being readvised of his rights, Fleming offered more details about the incident, such as the location of the shooting and what type of gun and shells he used. Approximately one hour later, the police transported Fleming to the Arenac County Sheriff's Department, where Fleming was advised of his *Miranda* rights yet again, and a recorded statement was taken. In his recorded statement, Fleming again confirmed that he shot York, but now claimed that York had threatened to kill Fleming and his family.

All told, the record indicates that the police advised Fleming of his *Miranda* rights on three separate occasions over the course of the day: first, after the police discovered drugs in Fleming's barn; second, several hours later in the narcotics van *after* Fleming already had confessed to Detective Lesneski; and, finally, at the police station before Fleming gave a recorded statement. Sergeant Clayton and Detective Lesneski claim that they never made any promises or threats to Fleming. Fleming, however, claims that, while he was not "directly" threatened, Sergeant Clayton did warn him to "get with the program" and Detective Lesneski did shout and gesture at him and then implored him "to cooperate."

Upon Fleming's motion to exclude his confession, the trial court held a *Walker* hearing to determine whether Fleming's initial inculpatory statements to Detective Lesneski were admissible at trial. As the majority points out, the parties dispute the precise issue addressed at the *Walker* hearing. The State claims that the hearing addressed only whether Fleming's statements were "voluntary." Fleming, on the other hand, contends that defense counsel also asserted that Fleming's statements should be excluded under *Mosley* because Sergeant Clayton and Detective Lesneski continued to interrogate Fleming and to pressure him to confess after he invoked his Fifth

Amendment right to remain silent. After hearing argument from both sides, the trial court concluded that Fleming's statements were admissible.

After a three-day jury trial, Fleming was convicted of second-degree murder and possession of a firearm during the commission of a felony. Fleming appealed his conviction as a matter of right to the Michigan Court of Appeals. In an unpublished opinion, the Michigan Court of Appeals affirmed Fleming's conviction. *Fleming*, 2002 WL 988568. In reaching that conclusion, the Michigan Court of Appeals found that Fleming had forfeited his *Mosley* claim because the *Walker* hearing "addressed only the voluntariness of his confession." *Id.* at *1. The Michigan Court of Appeals thus reviewed that claim for plain error only. *Id.* The Michigan Court of Appeals did not consider the merits of Fleming's *Mosley* claim outside the context of its plain-error inquiry. *Id.* at *1-2. The Michigan Supreme Court subsequently denied Fleming's application for leave to appeal. *People v. Fleming*, 659 N.W.2d 234 (Mich. 2003).

### III.

In light of the Michigan Court of Appeals' default ruling, if Fleming's *Mosley* claim is to be considered at all, it must be because the Michigan court's determination that Fleming had forfeited the claim was contrary to or an unreasonable application of controlling law, or unreasonable in light of the record. 28 U.S.C. § 2254(d). And that is precisely what the majority has determined. Although I agree with the majority's conclusion that Fleming's *Mosley* claim was not procedurally defaulted, I write separately on this point only because I disagree with the majority's suggestion that this holding rests on the State's concession that the *Mosley* issue had been raised in state court. Whether or not the State concedes the point, the record evinces that Fleming's *Mosley* claim was fairly presented at the *Walker* hearing, and thus the issue was properly preserved for appeal.

The doctrine of procedural default provides: "In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. Federal habeas review of a state court judgment thus is precluded under this doctrine only if the state court judgment "rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision." *Harris v. Reed*, 489 U.S. 255, 260 (1989).

In the direct review context, the adequate and independent state ground doctrine is jurisdictional. In the collateral review context, however, the doctrine is based on comity. *See Coleman*, 501 U.S. at 730-31 ("Without the rule, . . . habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws."). Nevertheless, the doctrine has a statutory dimension in the habeas context because it serves to reinforce AEDPA's exhaustion requirement. *See id.* at 732 ("In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court.").

Under AEDPA's exhaustion requirement, a habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, *by any available procedure*, the question presented." 28 U.S.C. § 2254(c) (emphasis added). To satisfy this requirement, a claim raised in a habeas petition must be "properly presented" to the state courts in a procedural context where a merits review is possible. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) ("Section 2254(c) requires only that state prisoners give state courts a *fair* opportunity to act on their claims." (emphasis in original)); *Franklin v. Rose*, 811 F.2d 322, 324-25 (6th Cir. 1987). Accordingly, it is not necessary for the state courts to resolve the claim, only that it be *fairly presented*. *See O'Sullivan*, 526 U.S. at 845.

As to Fleming's *Mosley* claim, the Michigan Court of Appeals concluded that the *Walker* hearing "addressed only the voluntariness of his confession," and thus concluded

that the claim had been "forfeited." *Fleming*, 2002 WL 988568, at \*1. The district court rejected that conclusion as contrary to controlling law, instead finding that the "clear record" showed that Fleming properly raised the issue and thus preserved his *Mosley* claim. *Fleming v. Metrish*, No. 04-CV-72365, 2007 WL 2875281, at \*4 (E.D. Mich. Sept. 28, 2007) (citing *Walker v. Engle*, 703 F.2d 959, 967 (6th Cir. 1983)). The transcript of Fleming's *Walker* hearing confirms the district court's conclusion.

In determining whether a claim has been "fairly presented," this Court has focused on four actions that a defendant can take that are significant in preserving a claim for habeas review: "(1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law." *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000). As the record demonstrates, Fleming's counsel took all four of these actions during the *Walker* hearing.

As to the first two factors, there is no serious question that defense counsel relied on both federal and state authority recognizing that the police must respect a suspect's right to remain silent. During closing arguments, defense counsel expressly referred to the Supreme Court's decision in *Mosley*, as well as cited to and quoted from *People v. Catey*, 356 N.W.2d 241 (Mich. Ct. App. 1984), the leading Michigan case interpreting and applying *Mosley*.

Relying on both *Catey* and *Mosley*, Fleming's counsel also unambiguously framed the issue in terms of a *Mosley* violation, arguing that Fleming's confession should be excluded because the police "ignored" his assertion of his Fifth Amendment right to remain silent. Quoting from *Catey*, defense counsel also specifically argued that the "subsequent interrogation" by Sergeant Clayton and Detective Lesneski had "the characteristics of a repeated effort to wear down the defendant's resistance." To support that claim, defense counsel elicited testimony that went not just to the voluntariness issue, but also to the circumstances under which Fleming ultimately was persuaded to

confess despite his earlier assertion of his intention to remain silent. The record thus confirms that defense counsel also satisfied the final two factors that this Court has considered "significant to the determination whether a claim has been 'fairly presented.'" *McMeans*, 228 F.3d at 681.

Despite this clear record, the State argues that Fleming failed to *fairly* present his *Mosley* claim to the trial court because Fleming's suppression motion challenged the admissibility of the confession on voluntariness grounds only. During closing arguments at the *Walker* hearing, the State certainly urged the court to focus on "nothing but voluntariness," and the trial court did state that the "only issue" it needed to resolve was "whether or not it was voluntary." But the trial court apparently understood the voluntariness inquiry as encompassing the *Mosley* issue,[6] as it ultimately held that, "[g]iven all the circumstances, I – I believe that [Fleming's] statement under *Edwards*, *Mosley*, *Katey* [sic] that under this fact scenario, it's voluntary."

In any event, regardless of whether the state trial court couched its ruling in terms of voluntariness, the only relevant question for determining procedural default is whether Fleming "fairly presented" his *Mosley* claim to the state courts. *See O'Sullivan*, 526 U.S. at 844-45. Because defense counsel undoubtedly did so, I would affirm the district court's determination that the Michigan Court of Appeals' ruling that Fleming forfeited his *Mosley* claim is an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

---

[6]The trial court seems to have conflated the inquiry into the voluntariness of Fleming's confession with the inquiry required under *Mosley*. The two inquiries, however, are distinct. "While the suspect's state of mind is central to the voluntariness finding, the *Mosley* test focuses on what the police did, and when, after the suspect exercised his or her right to remain silent." *United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992). Thus, under *Miranda* and *Mosley*, "a court need determine specifically whether there has been a voluntary waiver only after the government has carried its burden of showing that it complied with the required procedures." *Id.* at 1383 (citations omitted).

**IV.**

Having rejected the Michigan Court of Appeals' default ruling as contrary to controlling authority or unreasonable in light of the record, our review of Fleming's *Mosley* claim is not constrained by that court's plain-error review. Regardless of whether the Michigan courts addressed aspects of Fleming's claim in conducting that inquiry, it is evident that the Michigan courts never considered the merits of Fleming's *Mosley* claim outside the context of the plain-error inquiry. With no state court adjudication "on the merits" to which we must defer, we review the claim *de novo*.

In the habeas context, this Court reviews a district court's legal conclusions *de novo*, but will not set aside its factual findings unless they are clearly erroneous. *Dyer v. Bowlen*, 465 F.3d 280, 283-84 (6th Cir. 2006). State-court determinations, on the other hand, generally are governed by the standard of review set forth in the AEDPA. 28 U.S.C. § 2254(d). As explained above, however, AEDPA's deferential standard of review applies only to claims that were adjudicated "on the merits" by the state courts. 28 U.S.C. § 2254(d). Where a state court does not reach the merits of a claim, this Court applies *de novo* review. *Danner*, 448 F.3d at 376; *Maples*, 340 F.3d at 436.

Here, the Michigan Court of Appeals found that Fleming had forfeited his *Mosley* claim by failing to raise it at the *Walker* hearing. *Fleming*, 2002 WL 988568, at *1. Based on the default ruling, the Michigan Court of Appeals reviewed Fleming's claim for plain error only. *Id.* Under that standard, the Michigan Court of Appeals required Fleming to establish that the trial court's ruling regarding the "the voluntariness of his confession" was in error, and that "the error was plain, *i.e.* clear or obvious . . . [and] the plain error affected substantial rights." *Id.* In addition, the Michigan Court of Appeals noted that, even if Fleming made such a showing, "an appellate court must then exercise its *discretion* in deciding whether to reverse." *Id.* (emphasis added). The court further noted that "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* (internal quotation marks omitted). Clearly, the application

of the plain-error standard of review placed significant additional burdens on Fleming over and above the showing required under *Mosley*.

For the reasons explored in detail above, I believe that controlling authority dictates that the Michigan Court of Appeals' plain-error analysis does not constitute an adjudication "on the merits" for purpose of AEDPA. *See Benge*, 474 F.3d at 246; *Lundgren*, 440 F.3d at 765. Ignoring this controlling precedent, the majority concludes that AEDPA's deferential standard of review applies. I cannot subscribe to that conclusion.

In light of the Michigan court's ruling that Fleming had forfeited his *Mosley* claim, if we are to consider that claim at all it must be because the Michigan court's default ruling was contrary to or an unreasonable application of controlling law or unreasonable in light of the record. 28 U.S.C. § 2254(d). Although the majority rejects the Michigan court's determination that the claim had been procedurally defaulted, it nevertheless continues to insist that the state court's adjudication is entitled to deference under AEDPA. But once we determine that the Michigan court's default ruling was in error, we no longer are bound by whatever "safety valve" review the state courts may have applied to avoid serious injustice, regardless of whether that inquiry explored the merits of Fleming's claim to some extent. *See Lundgren*, 440 F.3d at 765 (holding that a state court's plain-error inquiry "is not equivalent to a review of the merits"); *see also Roy*, 907 F.2d at 390 (holding that a state court's plain-error inquiry is "not sufficiently a ruling on the merits").

If, as the majority now holds, the Michigan court's default ruling is wrong as a matter of law, then we no longer owe deference to the Michigan court's undeniably more burdensome review of Fleming's claim. Thus, the deferential review required under AEDPA is inapplicable, and we must review the claim *de novo*. *Maples*, 340 F.3d at 436 ("Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply.").

**V.**

Applying *de novo* review, as I conclude we must, it is evident that the police failed to fully respect and scrupulously honor Fleming's decision to cut off questioning.

### A.  A Suspect's Fifth Amendment Right to Cut Off Questioning

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V.  This privilege against self-incrimination requires that law enforcement officials "must cease" questioning any suspect who invokes his or her right to remain silent. *Miranda*, 384 U.S. at 473-74.

The *Miranda* safeguards "come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).  In other words, the term "interrogation" under *Miranda* "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301.  Whether police conduct constitutes "interrogation" is determined "without regard to objective proof of the underlying intent of the police." *Id.*  Thus, if a suspect invokes his or her Fifth Amendment right to remain silent, the police "must cease" all interrogation of the suspect, including any comments that "the police should know are reasonably likely to elicit an incriminating response."

In defining the scope of *Miranda*'s protections, the Supreme Court has concluded that "the admissibility of statements obtained after the person in custody has decided to remain silent depends . . . on whether his right to cut off questioning was *scrupulously honored*." *Mosley*, 423 U.S. at 104 (internal quotation marks omitted) (emphasis added). That is to say, the police violate a suspect's Fifth Amendment rights where they "fail[] to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Id.* at 105-06.  The *Mosley* Court,

however, rejected as "extreme" the notion that *Miranda* requires "a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances," reasoning that such a blanket rule "would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Id.* at 102.

The facts in *Mosley* supported the conclusion that the defendant's rights had been scrupulously honored because his subsequent statements were made to another officer, regarding another crime, and after a significant period of time had elapsed since the suspect had invoked his Fifth Amendment rights. 423 U.S. at 104-05. In addition, the Court emphasized that the suspect "was given full and complete *Miranda* warnings *at the outset* of the second interrogation," and was "*reminded again* that he could remain silent and could consult with a lawyer, and was carefully given a full and fair opportunity to exercise these options." *Id.* at 104-05 (emphasis added).

In assessing Fleming's claim, we first must determine whether the comments made by Detective Lesneski and Sergeant Clayton constitute "interrogation" under *Innis*. If so, we then must consider whether the police fully respected Fleming's decision to remain silent. That inquiry requires us to consider the totality of the circumstances, including, among other things, whether: (1) Fleming was advised of his *Miranda* rights before the initial interrogation; (2) questioning stopped immediately once Fleming asserted his right to remain silent; (3) the police waited a significant period of time after Fleming's invocation of his right to remain silent before questioning him again; (4) Fleming received fresh *Miranda* warnings *before* the interview that led to his confession; and (5) the subsequent interrogation concerned the same crime that was the subject of the first interrogation. Because we must examine the totality of the circumstances, these factors are merely signposts that help guide our inquiry. The fundamental consideration is, as the First Circuit has put it, whether the suspect remained "in charge of the decision whether and to whom he would speak." *United States v. Andrade*, 135 F.3d 104, 107 (1st Cir. 1998).

### B. *Innis* and *Mosley* Analysis

Approximately one hour into the search of Fleming's property, the police discovered drugs in Fleming's barn. At that point, Detective Lesneski advised Fleming of his rights, and asked if Fleming would be willing to talk to him. Fleming emphatically stated that he would not discuss any matters related to the homicide. Although Fleming did not state that he wished to remain "silent," the Supreme Court has long held that "no ritualistic formula or talismanic phrase is essential in order to invoke the privilege against self-incrimination." *Emspak v. United States*, 349 U.S. 190, 194 (1955). Fleming's refusal to discuss the homicide was sufficient to invoke his Fifth Amendment right to remain silent. *See McGraw v. Holland*, 257 F.3d 513, 518-19 (6th Cir. 2001) (holding that suspect invoked her Fifth Amendment privilege where she repeatedly made statements such as "I don't want to talk about it" in response to questions about the crime).

Detective Lesneski initially respected Fleming's decision, and immediately stopped questioning Fleming. Fleming was then arrested, handcuffed, and placed in the backseat of a state police vehicle. An hour or so later, Fleming was transferred from the backseat of the police cruiser to the front passenger seat of a police van.

There is no indication in the record that Fleming was transferred to Sergeant Clayton's custody in order to facilitate further questioning. Sergeant Clayton was called to the scene only after the search was underway, and only because the search team discovered narcotics on the premises. Moreover, Sergeant Clayton is a member of the narcotics team from the Ogemaw County Sheriff's Department, not the Arenac County Sheriff's Department, which was leading the investigation into York's murder. It thus is possible that Sergeant Clayton was unaware of the underlying homicide investigation that was the impetus for the search being conducted. In fact, Sergeant Clayton testified that he did not know what evidence the rest of the search team was looking for when they left to search the nearby creek.

Sergeant Clayton's motives, however, are irrelevant. *Innis*, 446 U.S. at 301. Because Fleming had invoked his Fifth Amendment right to remain silent, all coercive

police practices "must cease," and the police were required to "scrupulously honor" Fleming's decision to remain silent. Although Detective Lesneski's direct interrogation ceased, the police officers at the scene—whether intentionally or not is irrelevant—persisted "in repeated efforts to wear down [Fleming's] resistance" to questioning. *Mosley*, 423 U.S. 105-06. Fleming was arrested, placed in handcuffs, and then detained in custody at the scene for several hours while the search of his residence and property continued. The police kept Fleming in position to observe their search, and celebrated their discovery of the shotgun right in front of him. In fact, on Fleming's account, Detective Lesneski gestured in Fleming's direction and declared "Hell, yeah, I got you!" At this point, Sergeant Clayton told Fleming that things did not look good for him and then stated that it would be in Fleming's "best interest" to "do the right thing." According to Fleming, Sergeant Clayton also "strongly recommend[ed]" that Fleming "get with the program." Sergeant Clayton then asked Fleming whether he wished to talk to Detective Lesneski. At this point, Fleming relented.

Considering the totality of the circumstances, it is evident that the police did not "scrupulously honor" Fleming's decision to remain silent. Even if Fleming's version of events is discounted, Sergeant Clayton's statement that Fleming should "do the right thing," when considered in context, rose above the level of mere admonition. As an experienced police officer, Sergeant Clayton certainly should have known that such a statement, especially when made at the scene of an ongoing warrant search and shortly after the discovery of the murder weapon, was "reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301.

That conclusion is all the more certain if Fleming's version of events is accepted. According to Fleming, Sergeant Clayton also "strongly" encouraged him to "get with the program." Fleming also claims that Detective Lesneski explicitly advised him that it was in his best interest "to cooperate." Although neither Sergeant Clayton nor Detective Lesneski ever directly asked Fleming about the homicide, these statements, especially when taken together, demonstrate a persistent and not-so-subtle effort to persuade Fleming to discuss the homicide. Accordingly, I respectfully must disagree

with the majority's conclusion that these statements do not rise to the level of "interrogation" under *Innis*.

Recognizing the inherently "coercive pressures of the custodial setting," the *Mosley* Court emphasized that, once a suspect decides to terminate an interrogation, that decision must be "fully respected" and the police must not "try either to resume the questioning or *in any way to persuade* [a suspect] to reconsider his position." 423 U.S. at 104 (emphasis added). Although *Mosley* stopped short of creating a *per se* rule prohibiting the police from ever asking a suspect to reconsider his or her refusal to answer questions, it does require that the police make every effort to ensure that "such reconsideration is urged in a careful, noncoercive manner at not too great length and in the context that a defendant's assertion of his right not to speak will be honored." *United States v. Collins*, 462 F.2d 792, 797 (2d Cir. 1972).

The conduct of the police in this case is dramatically different in every relevant respect from the conduct that the Supreme Court found acceptable in *Mosley*. Here, the police did not seek to reinitiate questioning regarding a different crime. The police also did not reinitiate contact with Fleming in a careful or noncoercive manner. Nor did the police readvise Fleming of his *Miranda* rights *before* taking his statement. Rather, the police handcuffed Fleming and kept him locked in a car for several hours.[7] Then, they rejoiced in the discovery of evidence right in front of him, with the lead investigator gesturing and shouting at him. After building a rapport with Fleming during hours of "small talk," Sergeant Clayton then advised Fleming to "do the right thing" and encouraged him to "get with the program." And putting to rest any doubt that these comments were intended to do anything other than wear down Fleming's resistance to

---

[7]The majority considers the time that elapsed between Fleming's initial refusal to answer questions about the homicide to cut in favor of its conclusion that there is no *Mosley* violation. Although the time factor may lean slightly in the State's favor, this cannot be the crucial factor in determining whether a Fifth Amendment violation occurred in this case. Unlike *Mosley*, the conditions of Fleming's detainment did not permit him to independently reconsider his decision to remain silent. Fleming was kept in handcuffs at the scene the entire time. He also was subjected to repeated efforts by the police to convince him to discuss the homicide. Considering the totality of the circumstances, it does not appear that sufficient time elapsed to neutralize the "inherently compelling pressures" of Fleming's circumstances. *Miranda*, 384 U.S. at 467. In any event, other factors are much more probative of whether a *Mosley* violation occurred in this case.

questioning, Sergeant Clayton almost immediately asked Fleming if he wanted to speak to Detective Lesneski. And when Detective Lesneski arrived, he also pressured Fleming "to cooperate."[8] At this point, Fleming relented.

If the rule announced in *Mosley* is to have any meaning at all, certainly it must protect against such coercive tactics. Certainly, it must prevent law enforcement personnel from repeatedly pressuring a suspect to "do the right thing" and "get with the program." Certainly, it must preclude the police from explicitly pressuring a suspect "to cooperate" after the suspect already has invoked his or her Fifth Amendment right to cut off questioning.

Whether overt or more subtle, *Mosley* protects against the state's attempts to encourage, pressure, persuade, or coerce a suspect to abandon his or her decision to remain silent. Although *Mosley* permits the police to present new information to a suspect so that he is able "to make informed and intelligent assessments of [his] interests," 423 U.S. at 102, encouraging a suspect to "get with the program" and "do the right thing" so that he is not "sorry" for something he has not said certainly exceeds the scope of permissible interaction with a defendant who already has invoked his right to remain silent. Indeed, each of these comments evinces an unequivocal intent to persuade Fleming to confess, or at least abandon his decision to remain silent. Such efforts plainly are inconsistent with the duty of the police under *Mosley* to "scrupulously honor" a suspect's decision to remain silent.

Contrary to the majority's suggestion, Fleming is not required to show that the police interrogation was "very, very one-sided," as was the case in *Thompkins v. Berghuis*. Rather, Fleming must show only that the police failed to "scrupulously honor" his decision to remain silent. 423 U.S. at 104. In fact, it is the state that bears the

---

[8]In an effort to support its tenuous conclusion, the majority mischaracterizes some of Detective Lesneski's comments. In particular, the majority claims that Detective Lesneski's "suggestion" to cooperate was accompanied by "a caution not to say anything about which he [Fleming] would be 'sorry.'" But, as the majority opinion concedes earlier, Detective Lesneski told Fleming that he should not "be sorry for something you have *or haven't* said." Far from urging Fleming to be cautious, the suggestion that Fleming should not be sorry for something he *has not said* is yet another example of Detective Lesneski trying to chip away at Fleming's decision to remain silent.

"heavy burden" of demonstrating that the right to remain silent, once invoked, in fact has been "knowingly and voluntarily waived." *North Carolina v. Butler*, 441 U.S. 369, 372-73 (1979) (citation omitted). As the Third Circuit has noted, in those cases "where the right to remain silent was held not to have been scrupulously honored, the circumstances lead to a conclusion that the police resumed questioning for no other reason than to induce the defendant to change his mind." *Vujosevic v. Rafferty*, 844 F.2d 1023, 1029 (3d Cir. 1988) (citing *United States v. Charlton*, 565 F.2d 86 (6th Cir. 1977)). Such is the case here, as the comments by Sergeant Clayton and Detective Lesneski obviously were made "for no other reason than to induce" Fleming to abandon his decision not to answer questions about the homicide.

In describing the twin pillars of *Miranda*'s prophylactic warnings—the right to counsel and the right to remain silent—the Supreme Court repeatedly has insisted on a "relatively rigid" application of these requirements. *Fare*, 442 U.S. at 718. Underlying the Court's insistence on such rigidity is the recognition that "the coercive setting of custodial interrogation is ready-made for the infringement, whether intentional or inadvertent, of constitutional protections, such that suspects must be plainly advised of their rights so they may act on them." *Van Hook v. Anderson*, 488 F.3d 411, 430 (6th Cir. 2007) (Cole, J., dissenting). A rigid application of *Mosley* thus is necessary to protect against the inherently coercive pressures of the custodial setting, and to ensure that an in-custody confession is the result of a knowing and voluntary waiver of an individual's privilege against self-incrimination.

If, as the majority believes, the rule announced in *Mosley* tolerates the coercive pressures applied here, *Mosley*'s admonition that the police must "scrupulously honor" and "fully respect" a suspect's decision to cut off questioning will be rendered nearly meaningless. Indeed, on the majority's view, *Mosley* will protect against only the most egregious coercive practices. Badgering a suspect under the hot lights of an interrogation room is not the only means of wearing down a suspect's resistance to answering questions. To remain a viable deterrent against more subtle coercive practices, *Mosley* must be applied rigidly. *See Van Hook*, 488 F.3d at 430-31 (Cole, J.,

dissenting) (detailing the Supreme Court's insistence on a rigid application of the parallel rule of *Edwards v. Arizona*, 451 U.S. 477 (1981)).

Because the investigating officers did not *scrupulously* honor Fleming's decision to cut off questioning, any statements obtained after Fleming asserted his Fifth Amendment privilege were obtained in violation of *Mosley* and thus should not have been admitted into evidence.

### C. Harmless Error Analysis

Where a confession has been erroneously admitted in violation of a defendant's Fifth Amendment rights, this constitutional error is subject to a harmless error analysis. *See Arizona v. Fulminante*, 499 U.S. 279, 310-11 (1991) (Rehnquist, C.J., delivering the opinion of the Court with respect to this issue). To determine whether an error is harmless, this Court considers the "'prejudicial impact of [the] constitutional error'" and "whether the constitutional violation 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Vasquez v. Jones*, 496 F.3d 564, 575 (6th Cir. 2007) (quoting *Fry v. Pliler*, 551 U.S.112, 127 S. Ct. 2321, 2328 (2007), and *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). This standard applies in the context of § 2254 habeas claims regardless of whether the state courts recognized the error. *Vasquez*, 496 F.3d at 575.

Given the importance of Fleming's statements in proving the State's case, the admission of Fleming's confession was not harmless error. Fleming's confession—along with his recorded statements and testimony at trial, which are discussed below—undoubtedly was the strongest evidence of his guilt. Other than Fleming's own statements, the prosecution introduced no evidence corroborating that Fleming shot York or was ever present at the scene of the crime. Without Fleming's statements, the prosecution also would have been unable to provide the jury with a motive. Fleming's statements also were crucial in linking the gun to Fleming because

there was no physical evidence linking Fleming to the murder weapon.[9] Consequently, without Fleming's own incriminating statements, the prosecution would not have been able to establish the most critical elements of its case against Fleming.

Fleming's confession and testimony thus were very powerful and prejudicial evidence. *See Fulminante*, 499 U.S. at 296 (White, J., delivering the opinion of the Court as to this issue) ("A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." (internal quotations and citation omitted)). Therefore, the admission of Fleming's incriminating statements was not harmless error because it prejudicially impacted Fleming's trial and had a "substantial and injurious effect or influence in determining the jury's verdict." *Vasquez*, 496 F.3d at 575. *See Kordenbrock v. Scroggy*, 919 F.2d 1091 (6th Cir. 1990) (en banc) (finding that admission of confession obtained in violation of *Miranda* was not harmless error because "the portion of [the defendant's] confession taken after the *Miranda* violation – other than the inferences to be made from the fact of the robbery and shooting – was the only concrete, noncircumstantial piece of evidence the state had to prove the premeditation element of the crime").

### D. Post-*Miranda* Statements and Trial Testimony

The State argues that any error was harmless because Fleming's first confession was merely cumulative of Fleming's subsequent statements to the police and his own testimony at trial. This argument, however, assumes that Fleming's subsequent statements to the police and his testimony at trial should not also be excluded. That assumption is mistaken. Although Fleming made additional incriminating statements to the police after he received a fresh *Miranda* warning, and also testified at trial to

---

[9] The only evidence to this effect was testimony that Fleming owned a shotgun that looked similar to or was the same model as the shotgun found in the creek. Although the shotgun was discovered in a stream on or near Fleming's property, Fleming was renting the property at the time, the property was expansive and open, and the location where the gun was found was a part of the creek that was "kind of a party spot, or used to be."

shooting York, those statements also should have been excluded because Fleming's first confession was elicited in violation of *Mosley*.

Under *Oregon v. Elstad*, 470 U.S. 298 (1985), if an interrogation elicits a voluntary confession but the interrogating officers failed to administer a *Miranda* warning, subsequent incriminating statements are not necessarily poisoned by the fact that the first confession occurred without a proper *Miranda* warning. *Id.* at 309-10. However, *Elstad* applies only where the first confession is "unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will" or otherwise the product of a constitutional violation, such as "police infringement of the Fifth Amendment itself." *Id.* 309.

In this case, unlike *Elstad*, the failure of the police to scrupulously honor Fleming's invocation of his right to remain silent was not merely a procedural error in administering *Miranda* warnings. Rather, the investigating officers' repeated efforts to wear down Fleming's resistance to questioning constitute "police infringement of the Fifth Amendment itself."[10]

Other relevant factors that traditionally guide our inquiry into whether a confession obtained in the wake of a Fifth Amendment violation should be admitted into evidence also weigh in favor of exclusion. In deciding whether a second confession has been tainted by a prior coerced statement, the Supreme Court has instructed courts to "examine the surrounding circumstances and the entire course of police conduct with respect to the suspect." *Elstad*, 470 U.S. at 318. In particular, courts must consider "the time that passes between confessions, the change in place of interrogations, and the

---

[10]Logically, this would seem to be true of all cases involving *Mosley* violations, especially where the police engaged in deliberate "efforts to wear down [a suspect's] resistance and make him change his mind," *Mosley*, 423 U.S. at 105-06, because such coercive police tactics are akin to the deliberate "police strategy adapted to undermine the *Miranda* warnings" that the Supreme Court held in *Missouri v. Seibert*, 542 U.S. 600, 616 (2004) (plurality), requires the exclusion of post-*Miranda* statements. Taken together with Justice Kennedy's more narrow concurrence, a majority of the Court in *Seibert* agreed that a "deliberate" question-first strategy would preclude post-warning statements unless curative measures were taken. *Id.* at 622 (Kennedy, J., concurring) ("The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.").

change in identity of the interrogators." *Id.* at 310. Whether effective *Miranda* warnings preceded the subsequent statements also is relevant. *Westover v. United States*, decided together with *Miranda*, 384 U.S. at 496-97.

In Fleming's case, an examination of these factors makes clear that there was no "break in the stream of events . . . sufficient to insulate [his post-*Miranda*] statement from the effect of all that went before." *Clewis v. State of Texas*, 386 U.S. 707, 710 (1967). Fleming's subsequent incriminating statements were elicited in close proximity to the first, unconstitutionally-obtained confession. *See Seibert*, 542 U.S. at 614 ("[I]t would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle."). And, unlike other cases where this Court has permitted the admission of subsequent statements, there was no relevant change in Fleming's custodial conditions. *See Coomer v. Yukins*, 533 F.3d 477, 491 (6th Cir. 2008) (upholding as reasonable the admission of subsequent statements elicited after "several hours had passed since her first oral confession" because police informed the defendant that "circumstances had changed [and] that she was now in custody"); *United States v. McConer*, 530 F.3d 484, 497 (6th Cir. 2008) (finding no error in admission of incriminating post-*Miranda* statements made after initial unwarned but voluntary statements that were not elicited as the result of "interrogation"). Given that Detective Lesneski's second set of *Miranda* warnings was delivered in the middle of a confession that was elicited in violation of *Mosley*, Fleming's post-*Miranda* statements also should have been excluded. *See Untied States v. Pacheco-Lopez*, 531 F.3d 420, 429-30 (6th Cir. 2008).

Whether Fleming's trial testimony also is tainted by the admission of Fleming's prior incriminating statements is a closer call. Because the trial court failed to exclude statements elicited in violation of Fleming's Fifth Amendment rights, it is impossible to say whether Fleming would have adopted a different trial strategy and decided not to testify in his own defense. *Compare Burks v. Perini*, No. 85-3507, 1986 WL 18388, at *1 (6th Cir. Nov. 25, 1986) ("Accordingly, this court concludes that the government's

use of Burks' involuntary statement did not induce him to testify on his own behalf and that the trial court's decision to admit his confession, although erroneous under the circumstances, constituted harmless error."). Because the entire thrust of Fleming's trial strategy was determined by the trial court's failure to exclude his confession, however, Fleming's trial testimony must be set aside in determining whether harmless error occurred. *See Kordenbrock*, 919 F.2d at 1099-1100.

## VI.

For the foregoing reasons, I respectfully dissent from the majority's resolution of Fleming's *Mosley* claim. I would affirm the district court's decision to grant the habeas petition on that basis and order that Fleming be retried or released.