**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0272n.06

Case No. 19-1437

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

**FILED**
May 14, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOHN OLIVER WOOTEN, | ) | |
| | ) | ON APPEAL FROM THE |
| Petitioner-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| PATRICK WARREN, Warden, | ) | |
| | ) | **O P I N I O N** |
| Respondent-Appellee. | ) | |

BEFORE: GIBBONS, McKEAGUE, and WHITE, Circuit Judges.

**McKEAGUE, Circuit Judge.** On August 5, 2011, John Wooten shot two people outside a gentlemen's club in Detroit, killing one of them. He claims he shot them in self-defense. Wooten was charged with murder and assault with intent to commit murder. He was tried twice on those charges. His first trial ended in a mistrial after the prosecution asked a police officer a question that the court deemed improper. But the court did not bar reprosecution. Wooten was then convicted at the second trial.

After the state appellate courts affirmed his convictions, Wooten petitioned for a writ of habeas corpus. He argued that (a) having a second trial violated his Double Jeopardy rights, and (b) there was constitutionally insufficient evidence at his second trial. The district court denied Wooten's petition. We AFFIRM.

## I.  BACKGROUND

On August 5, 2011, a little before 2:00 AM, John Wooten shot and killed Alfonso Thomas outside the Pretty Woman Lounge in Detroit, Michigan. He also shot Omar Madison in the back, although Madison lived to tell about it. Wooten fled the scene and threw his weapon—a .357 revolver—into the bushes. Although a warrant for his arrest was issued in August, Wooten was not arrested until December 2011, four months after the shooting. The prosecution and Wooten offered different versions of what exactly happened on August 5. According to the prosecution, Wooten was making threatening statements in the bar that night and tried to bring a gun inside; after the bar manager threw him out, Wooten turned around and shot two people. According to Wooten, he was acting in self-defense—returning fire after Thomas shot at him. Wooten was tried twice. The first trial ended with a mistrial, the second with a conviction.

A.  *First Trial*

Wooten was originally charged with first- and second-degree murder, assault with intent to commit murder, and two firearms charges. His first trial was in July 2012. It ended in a mistrial before the prosecution could rest its case. Before the mistrial motion, the prosecution had relied in large part on two eyewitnesses. The first was Omar Madison, the Pretty Woman bar manager Wooten had shot in the back. The second was Anthony Gary, the bar promoter whose gun the other victim, Alfonso Thomas, had grabbed shortly before the shooting. Both testified that Wooten was the one who shot Thomas. Both also testified that nobody else fired a shot that night.

The prosecution's case suffered two major blows. First, the prosecution was prohibited from asking Madison about a prior incident involving Wooten that could have helped prove premeditation or intent.

Second, the prosecution was prohibited from going into a different line of questioning on Fifth Amendment grounds. The prosecution had called the homicide investigator in charge of the case. By this point, Wooten's lawyer had been asking questions about the gun that Thomas was holding when the shooting occurred—presumably to help build Wooten's self-defense argument. So the prosecutor asked the investigator whether Wooten had ever come forward to explain to the police that he had acted in self-defense. Wooten's lawyer objected, on grounds that the question violated his client's Fifth Amendment rights, and the court sustained the objection. The parties then convened for a sidebar discussion, which does not appear in the trial record.

Later, a similar question from the prosecutor led to a mistrial. On redirect examination of the homicide investigator, after extensive discussion of the second gun, the prosecutor asked the following question: "In this case would you have enjoyed talking to the defendant?" Wooten's lawyer objected, the court sustained, and the parties held a sidebar conference.

The judge scolded the prosecutor for discussing Wooten's failure to come forward to the police. The judge had told the prosecutor at the earlier sidebar conference that he could not go into this line of inquiry. The prosecution claimed that the question was in response to the questions about the second gun.

Wooten moved for a mistrial. Defense counsel argued that the case should be dismissed with prejudice, which would bar a retrial. He contended that the prosecutor's question was an intentional act of prosecutorial misconduct, citing *Oregon v. Kennedy*, 456 U.S. 667 (1982). The prosecutor argued in opposition.

The judge granted the mistrial. In doing so, the judge talked at length on several topics. First, the judge flatly rejected the prosecution's substantive arguments that the question was proper. Next, the judge went on to discuss the state of the prosecution's case. The case against

Wooten was going poorly, in his opinion, particularly on the first-degree murder charge. In fact, the judge said, if Wooten had moved for a directed verdict on the first-degree murder charge, that motion would have been granted.

However, the judge did not find that the prosecutor intended to provoke a mistrial. The judge stated:

> Sometimes when we wind up getting involved in the give and take of a trial, the heat of combat overwhelms our rational decision making processes, and I think that may very well have been the situation today.

The judge acknowledged that his ruling benefited the prosecution. But he "hope[d] and pray[ed] that that's not what the reasoning was of the prosecution to have done what it did. I'm giving him the benefit of the doubt." The parties then scheduled the new trial.

B. *Second Trial*

The second trial was held in November 2012. At the beginning of the trial, Wooten's lawyer moved to reconsider the issue of whether the retrial should be barred, specifically mentioning that he was seeking to preserve his rights for appeal. But the court denied the motion and continued with the trial.

The prosecution's key witness was Omar Madison, the bar manager and shooting victim. He testified to two incidents: the shooting and an earlier incident involving Wooten at the Pretty Woman. In the earlier incident, according to Madison, a few weeks before the shooting, Wooten threw something in the bar. It hit Madison, although Madison acknowledged that Wooten said he had not intended to hit him. Still, Madison told Wooten he had to go, and he had the bouncer escort Wooten out. As soon as Wooten got outside the door, he started shooting up in the air. (Madison was inside when this happened and the door was closed, so he didn't actually see Wooten shoot.)

Later that night, Wooten pulled up in front of Madison in the parking lot. He confronted Madison and asked if they had a problem. According to Madison, he could see that Wooten was holding a revolver. The two talked their issues over and then went their separate ways. Madison did not report the incident to the police.

On August 5, 2011, the night of the shooting, Madison testified that he had heard Wooten and his friend "C" inside the bar making what Madison perceived as threatening comments— things like "We run this bar. I stick this bar up."

Madison said that Wooten and C left the bar for a little while, and when they came back, they refused to be searched, even though it was bar policy to search everyone for weapons before entry. Madison approached them, reached for Wooten, and felt Wooten's gun in his front waistband (a revolver). Madison told Wooten that he could not bring the gun into the bar, at which point Wooten became obnoxious. Wooten then seemed to reach for his gun, so Madison grabbed him and held the gun. C then grabbed Madison to try to pull him off Wooten, and Anthony Gary (the promoter) in turn grabbed C.

Madison testified that the four of them eventually made their way outside the bar. After a little while, Madison said to Alfonso Thomas: "Boo [Thomas's nickname], you got him. I'll be letting him go. I'm about to let him go." Thomas had with him a .380 semiautomatic handgun, which Madison later learned was Anthony Gary's gun. Madison wanted to make sure that Thomas could deter Wooten from firing the revolver and hurting somebody.

According to Madison, he let Wooten go, and Wooten started to take a couple of steps away. Madison turned to go back in the bar. Then Wooten started shooting, and he hit Madison from behind. Madison was able to turn and see Wooten shoot Thomas. He never saw Thomas shoot at Wooten.

The prosecution offered several other eyewitnesses, who testified to Wooten's shooting at Madison and Thomas. The prosecution also offered evidence to rebut the claim that a second gun was fired that night—that is, that Thomas fired at Wooten, prompting him to return fire in self-defense. Investigating officers testified that they found no evidence that a second gun was fired. Anthony Gary, who owned the gun in question, testified that he examined the gun later that night and found that it was still fully loaded.

Wooten also testified in his own defense. He started with the incident a few weeks before the shooting. Apparently, he had thrown his hands up in the air and a drink had slipped out, accidentally hitting Madison. Madison approached him, and Wooten explained that he had not meant to hit him. Not wanting an altercation, Wooten claimed he left of his own accord. Once he walked outside the bar, Wooten heard gunshots go off—but they weren't fired by him, because at that time he didn't have his gun.

Next, the night of the shooting. Wooten testified that he had his gun with him that night—a .357 revolver—because it was a rough neighborhood. But when he first entered the bar, the bouncer let him in *with* his gun. Later in the night, Wooten left the bar to go smoke weed and returned after about half an hour. When he went to go back in the bar, the bouncer gestured at Madison, who was right behind them counting the proceeds from that night. Wooten took this gesture to mean that the bouncer could not let him into the bar with the gun while the boss was watching, so the two made some small talk to wait until Madison was not paying attention.

Wooten said he was already heading out the door when Madison grabbed him from behind, lifting him up. Wooten heard Madison say "Pull your gun. Pull your gun. Get ready. Are you ready?" Wooten testified that he heard the safety of a gun click and, after Madison released him, saw Thomas with a gun pointed at him. And then, according to Wooten, Thomas fired at him. So

Wooten pulled out his gun and returned fire. He realized he hit Thomas, so he got scared and took off running. Wooten hid in an alley and threw his gun in the bushes. He did not talk to the police, because he had contacted some lawyers who had told him not to say anything to the police until he had retained a lawyer.

### C. *Verdict, Direct Appeal, and Proceedings in the District Court*

The jury convicted Wooten of second-degree murder, assault with intent to commit murder, and two firearms offenses. On direct appeal, Wooten argued that (1) the court should have barred the second trial on Double Jeopardy grounds, (2) there was insufficient evidence at the second trial, and (3) the prosecutor committed misconduct at closing argument. The Michigan Court of Appeals affirmed on all grounds. The Michigan Supreme Court denied leave to appeal, after hearing oral argument.

In January 2017, Wooten filed a pro se petition for a writ of habeas corpus in the Eastern District of Michigan. He raised the same three issues as he did in his direct appeal. The district court then appointed counsel, and counsel filed a supplemental brief addressing the claims. The district court denied the petition and issued a certificate of appealability only on the Double Jeopardy claim. This court then expanded the COA to include Wooten's sufficiency argument.

## II. ANALYSIS

### A. *Standard of Review*

This court reviews the district court's legal conclusions de novo and its factual findings for clear error. *Davis v. Lafler*, 658 F.3d 525, 530 (6th Cir. 2011) (en banc). The district court applies the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, a district court can grant a petition for a writ of habeas corpus only if the state-court adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States" or if the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Before analyzing the merits, we first address Wooten's arguments that AEDPA deference does not apply in his case.

B. *Does AEDPA Deference Apply?*

1. Plain-Error Review and AEDPA Deference

Wooten first argues that the state court should not receive AEDPA deference because it erroneously analyzed the Double Jeopardy issue under a plain-error standard of review. AEDPA deference applies only when the state court decided the issue "on the merits." 28 U.S.C. § 2254(d). Under Sixth Circuit precedent, AEDPA deference "applies to a state court's plain-error analysis if it 'conducts any reasoned elaboration of an issue under federal law.'" *Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017) (quoting *Fleming v. Metrish*, 556 F.3d 520, 531 (6th Cir. 2009)). But Wooten argues that this rule applies only to cases where the state court properly applied plain-error review. And here, Wooten claims, the court applied plain-error review only because it incorrectly held that Wooten had failed to preserve the Double Jeopardy issue in the trial court.

We conclude that AEDPA deference applies. Under *Fleming*, we apply deference to the state court's plain-error merits analysis even if the court's underlying procedural reasoning is incorrect. 556 F.3d at 532. In *Fleming*, the state court applied plain-error review because it found that the claim had been procedurally defaulted. *See id.* We disagreed with the state court's procedural-default reasoning, but we applied AEDPA deference anyway. *Id.* Citing principles of comity, finality, and federalism, we explained that "[t]he state court's substantive reasoning does not simply vanish along with its erroneous procedural-default determination. Nor does AEDPA." *Id.*

Here, the state court held that Wooten had not preserved his Double Jeopardy argument. The district court concluded that this preservation ruling was incorrect, and on appeal the state is no longer arguing that Wooten failed to preserve his claim. But the state appellate court examined the merits anyway, and it even determined that there was no constitutional error—"[t]his is not a case where the state court simply assumed, without deciding, that there was a constitutional error and then proceeded to determine that the error was not plain." *Id.* Under *Fleming*, AEDPA deference applies to this adjudication.

2. Did the State Court Adjudicate the Double-Jeopardy Issue "On the Merits"?

Second, Wooten contends that the state court's adjudication of the Double Jeopardy issue was unreasonable because it did not mention every basis for finding that the prosecutor intended to provoke a mistrial. Here, the Michigan Court of Appeals dismissed Wooten's Double Jeopardy argument based on its conclusion that the prosecutor's question was constitutionally permissible. But it did not address the secondary argument that, even if the question was proper in isolation, it still showed the prosecutor's intent to provoke a mistrial because the question violated a clear order from the trial court. However, we find that it did not need to do so in order to receive AEDPA deference.

Again, for AEDPA deference to apply, the state court must have adjudicated the federal claim "on the merits." 28 U.S.C. § 2254(d). When a federal claim has been presented to a state court, there is a rebuttable presumption that the state court adjudicated the claim on the merits. *Johnson v. Williams*, 568 U.S. 289, 292–93 (2013); *Harrington v. Richter*, 562 U.S. 86, 99 (2011). The presumption applies "when a state-court opinion addresses some but not all of a defendant's claims." *Williams*, 568 U.S. at 298. The presumption can be rebutted only "when there is reason

to think some other explanation for the state court's decision is more likely." *Richter*, 562 U.S. at 99–100.

The *Richter/Williams* presumption applies to a state court's opinion that decides a federal claim but does not explicitly address every relevant fact or argument. *See Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1210–12 (11th Cir. 2013). "It makes no sense to say that a state court decision is entitled to AEDPA deference if the opinion fails to contain discussion at all of a claim but is entitled to no deference if it contains some but less than complete discussion." *Id.* at 1212.

Here, AEDPA deference applies. Under *Williams* and *Richter*, we presume that the state court adjudicated the federal claim on the merits. And here, the state court explicitly resolved Wooten's Double Jeopardy argument. The *Kennedy* goaded-mistrial rule involves examining all the relevant circumstances, but that doesn't mean the court must explicitly mention every relevant circumstance in its opinion. *See id.* And Wooten has not pointed us to anything to rebut the *Richter/Williams* presumption. Accordingly, AEDPA deference applies to the state court's decision here.

C. *Was the State Court's Determination Contrary to or an Unreasonable Application of*
   Oregon v. Kennedy*?*

Under AEDPA, the court cannot grant habeas relief unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1). That means Wooten must point to the holdings—not dicta—of Supreme Court precedents in making his claim for relief. *See Ross v. Petro*, 515 F.3d 653, 660 (6th Cir. 2008).

Wooten argues that the facts of his case establish that the prosecutor intended to provoke a mistrial. Therefore, according to Wooten, the Michigan Court of Appeals issued a decision that was an unreasonable application of *Oregon v. Kennedy*, 456 U.S. 667 (1982).[1] Under *Kennedy*, when a mistrial is granted on the defendant's motion, reprosecution will be barred if the prosecutor "intended to 'goad' the defendant into moving for a mistrial." *Id.* at 676. The intent standard "calls for the [trial] court to make a finding of fact." *Id.* at 675. The prosecutor's intent is inferred "from objective facts and circumstances" of the trial. *Id.*

Here, Wooten's *Kennedy*-based argument turns on one question from the prosecutor to the officer in charge of the investigation: "Would you have enjoyed talking to the defendant?" Two issues follow from that: (1) Was the substance of the question constitutionally improper? (2) Did the context in which the question was asked demonstrate that the prosecutor intended to provoke a mistrial?

With regard to the substance of the question, a key issue on direct appeal was whether using Wooten's prearrest silence violated his constitutional right against self-incrimination. In this appeal, Wooten does not make any argument that, under current law, asking about Wooten's prearrest silence was unconstitutional. *See Salinas v. Texas*, 570 U.S. 178, 181 (2013) (plurality); *Abby v. Howe*, 742 F.3d 221, 228 (6th Cir. 2014). Instead, he argues that the question probed further than prearrest silence, implicating both his postarrest silence and his failure to testify at the first trial.

---

[1] Wooten also argues that the "manifest necessity" standard should apply, rather than *Kennedy*, because he did not consent to the mistrial. *See Tinsley v. Million*, 399 F.3d 796, 812 (6th Cir. 2005). But he framed his argument to the Michigan Court of Appeals solely in terms of the standard set forth in *Kennedy*, arguing only that the trial court erred in finding that the prosecutor did not intend to provoke a mistrial. Indeed, he appeared to concede that trial counsel should have done more if he wanted to withdraw his motion for mistrial and continue with the trial: "The Defendant should have retracted his motion for a mistrial upon hearing that [the court would have granted a motion for directed verdict], but in good faith did not." At oral argument, Wooten also pointed us to *United States v. Dinitz*, 424 U.S. 600 (1976). But that pre-*Kennedy* case did not even involve prosecutorial misconduct, *see id.* at 601–05, which is the entire basis for Wooten's Double Jeopardy argument here.

But the Michigan Court of Appeals reasonably found that the context reveals that the prosecutor's question dealt only with prearrest silence. Regarding postarrest silence, the first time the prosecutor brought up Wooten's failure to come forward to claim self-defense, he explicitly said, "I'm not concerned with anything after he was arrested[.]" And later, when the prosecutor asked, "Would you have enjoyed talking to the defendant?" it was in the context of the investigation of whether a second gun had been fired—nobody had ever mentioned anything about what happened to Wooten after he was arrested. Regarding Wooten's failure to testify, asking a police officer whether she would have "enjoyed talking to the defendant" does not necessarily implicate the defendant's failure to testify in his defense. If Wooten were to testify in the first trial, then the attorneys would have been the ones asking him questions—so he would not have been "talking to" the police officer at all.

We also consider the context of the question. Wooten argues that the prosecutor's question demonstrated his intent to provoke a mistrial based on the context in which it was asked—particularly (a) the poor state of the prosecution's case and (b) the trial court order not to go into that line of inquiry.

Whether a prosecutor intended to provoke a mistrial motion is a question of fact. *Kennedy*, 456 U.S. at 675. Even on direct appeal, these factual findings are reviewed for clear error. *United States v. Foster*, 945 F.3d 470, 474 (6th Cir. 2019). The standard is even higher in the habeas context. State court findings of fact are "presumed to be correct." 28 U.S.C. § 2254(e)(1); *see also Wei v. Burt*, No. 18-2438, 2019 WL 1531516, at *2 (6th Cir. Mar. 26, 2019) (applying Section 2254(e) presumption to a state court finding that the prosecutor did not intend to provoke a mistrial). The petitioner can rebut that presumption, but only upon a showing of error by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). And a habeas court will not overturn a state-court

adjudication unless it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). And special deference is given to the trial court's credibility determinations, particularly when made on the basis of oral (as opposed to documentary) evidence. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 500 (1984).

Here, the state trial court credited the prosecutor and believed that he did not intend to provoke a mistrial. The court made that ruling based on its observation of a live court proceeding, and the ruling was made very shortly after the events themselves happened. There are other factors supporting the state court's finding. The prosecutor argued against Wooten's mistrial motion. *See United States v. White*, 914 F.2d 747, 752 (6th Cir. 1990) (noting that the prosecutor "resisted and apparently was surprised by the granting of the motion for a mistrial"). The mistrial motion was based on a single improper question. *See Foster*, 945 F.3d at 474–75 (affirming a finding that the prosecutor lacked intent to provoke a mistrial despite a "litany" of constitutional violations). And the improper question came well after the original Fifth Amendment ruling. *See State v. Yetman*, 516 S.W.3d 33, 43 (Tex. Ct. App. 2016) (in a case where the court affirmed a finding of prosecutorial intent to provoke a mistrial, the improper question came immediately after the court ruled that the prosecutor's line of argument was off-limits).

The trial judge was the one who observed the demeanor of the lawyers and was in a much better position to determine what the prosecutor intended in that moment. The *Kennedy* standard is an "exacting" one in general. *Phillips v. Court of Common Pleas*, 668 F.3d 804, 811 (6th Cir. 2012). Combine that with AEDPA deference and you have an incredibly high hurdle, especially

when it comes to credibility determinations. Wooten has not cleared that hurdle. We find that Wooten has not established that the state court's ruling in his case was contrary to or an unreasonable application of *Oregon v. Kennedy*.

### D. *Sufficiency of the Evidence*

Wooten also argues that there was constitutionally insufficient evidence to convict him. This claim can be analyzed in two parts. First, Wooten argues that the prosecution did not meet its burden in disproving his self-defense theory. Second, he argues that there was insufficient evidence of his mental state to convict him of second-degree murder and assault with intent to commit murder.

It is difficult to prevail on sufficiency claims on habeas review. This is because there are two layers of deference. First, there is the deferential standard articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979). Under *Jackson*, we defer to the trier-of-fact's verdict by reviewing the evidence in the light most favorable to the prosecution and asking whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 319. Next, "deference should be given to the Michigan Court of Appeals' consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008). In other words, "a federal habeas court must ask whether the state court decision reflected an unreasonable application of the *Jackson* standard to the facts of the case." Brian R. Means, *Postconviction Remedies* § 31.2 (July 2019).

Wooten's sufficiency argument goes to his convictions for second-degree murder and assault with intent to commit murder. Under Michigan law, the elements of second-degree murder are: "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse." *People v. Roper*, 777 N.W.2d 483, 490 (Mich. Ct. App. 2009) (per curiam) (internal

quotation marks and citation omitted). "The elements of assault with intent to commit murder are: (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *People v. Brown*, 703 N.W.2d 230, 236 (Mich. Ct. App. 2005) (internal quotation marks, citations, and footnote omitted). As a defense to those crimes, a defendant can claim self-defense— that is, that he "honestly and reasonably believe[d] that the use of deadly force [was] necessary to prevent the imminent death of or imminent great bodily harm to himself or herself[.]" Mich. Comp. Laws § 780.972(1)(a). Once a defendant presents a prima facie case of self-defense, then the burden of proof shifts to the prosecution to disprove the self-defense claim beyond a reasonable doubt. *See People v. Denson*, 902 N.W.2d 306, 315 (Mich. 2017).

The government argues (and the district court found) that Wooten's self-defense argument was not cognizable in habeas because it was based on an affirmative defense, not a substantive element of Michigan criminal law. *See People v. Reese*, 815 N.W.2d 85, 101 n.76 (Mich. 2012) ("An affirmative defense, like self-defense, 'admits the crime but seeks to excuse or justify its commission. It does not negate specific elements of the crime.'" (quoting *People v. Dupree*, 788 N.W.2d 399, 405 n.11 (Mich. 2010))). Wooten counters that, because of Michigan's burden-shifting framework, the prosecution must disprove self-defense as part of proving the elements of the substantive offense. But in any event, we need not decide whether the claim is cognizable, because we conclude that there was constitutionally sufficient evidence to find that (a) Wooten did not act in self-defense, and (b) Wooten acted with a mental state sufficient to satisfy the elements of both second-degree murder and assault with intent to commit murder.

1. Self-Defense

Wooten claims there was not enough evidence to conclude that he did not act in self-defense. He points to evidence that the Michigan Court of Appeals allegedly "ignored." He

contends that the court ignored the witness admissions that Thomas had grabbed Gary's gun off Gary's hip. And he contends that the court ignored evidence that Madison told Thomas to grab a gun. Wooten also points us to evidence indicating that Gary "surreptitiously" took his gun away from the crime scene and then didn't tell the police about it. Finally, Wooten points us to the bouncer's testimony that Wooten wasn't making any threatening gestures and that, during the tussle, other bar patrons were yelling "We got him. We got him. We got him." All this shows, according to Wooten, that he fired at Thomas and Madison only because he feared for his life.

But this was not the only possible interpretation of the events. The jury could have given more credit to the account offered by one of the victims, Omar Madison. *See O'Hara v. Brigano*, 499 F.3d 492, 499–500 (6th Cir. 2007). According to Madison, Wooten and his friend were making threatening comments while Wooten was inside the bar. Further, Madison testified that Wooten was refusing to be searched and became obnoxious once Madison called him out for trying to bring a gun into the bar. According to Madison, Wooten seemed to be reaching for his gun—that's when Madison grabbed him. And Madison said he yelled for Thomas simply so he could make sure Wooten didn't hurt anybody. Finally, there was testimony that Thomas was not pointing the gun at Wooten, and Wooten took a few steps away from everyone at the bar before turning around and shooting. Drawing on this, the jury could well have concluded that Madison was simply doing his job as bar manager in securing an unruly customer and that Wooten did not have a reasonable fear of imminent death or great bodily harm. Thus, there was enough evidence for a rational trier of fact to infer that Wooten did not act in self-defense.

2. Mental State

Wooten also argues that he did not have a sufficient mental state to be convicted of murder or assault with intent to commit murder. For mental state, Michigan second-degree murder requires

a finding of malice. *Roper*, 777 N.W.2d at 490. "Malice is defined as the intent to kill, the intent to cause great bodily harm, or the intent to do an act in wanton and wilful [sic] disregard of the likelihood that the natural tendency of such behavior is to cause death or great bodily harm." *Id.* (internal quotation marks and citation omitted). In contrast, assault with intent to commit murder requires an "actual intent to kill." *Brown*, 703 N.W.2d at 236–37. On the question of actual intent to kill, the jury

> may, and should take into consideration the nature of the defendant's acts constituting the assault; the temper or disposition of mind with which they were apparently performed, whether the instrument and means used were naturally adapted to produce death, his conduct and declarations prior to, at the time, and after the assault, and all other circumstances calculated to throw light upon the intention with which the assault was made.

*People v. Taylor*, 375 N.W.2d 1, 8 (Mich. 1985) (per curiam) (internal quotation mark and citation omitted).

Here, there is enough evidence to infer both malice and an actual intent to kill. On the malice question, Michigan juries can infer malice from the defendant's use of a deadly weapon. *See Stewart v. Wolfenbarger*, 595 F.3d 647, 658 (6th Cir. 2010) (collecting cases). Wooten admitted he fired the gun, and he does not claim it discharged accidentally.

On the actual intent to kill question, the jury could find that Wooten was the aggressor and that he bore a grudge against Madison. There is testimony supporting each of the following facts: (1) Wooten reacted angrily to being thrown out of the bar after the drink-throwing incident and even threatened Madison with a gun; (2) Wooten and his friend were making threatening comments on the night of the shooting even before the altercation; (3) Wooten initiated the conflict by refusing to be searched and then reaching for his weapon; and (4) Wooten did not shoot immediately, but instead took a few steps away from the building and then turned to shoot. In light

of this evidence, we conclude that Wooten has not met his heavy burden in establishing his right

to habeas relief on the grounds of insufficiency of the evidence.

### III. CONCLUSION

For these reasons, we AFFIRM the judgment of the district court.